### THE HOPE AND THE FREDDIE L. PORTER.

*(District Court, D. Maine. September 27, 1880.)*

1. COLLISION—STATEMENTS OF CREW.—Courts of admiralty are generally inclined to accept the statements of a crew, as to the movements of their own ship, rather than those coming from those on board another vessel.

   *The Empire State,* 1 Ben. 19.

2. SAME—CONFLICT OF TESTIMONY.—In cases of collision, where there is a great conflict of testimony, the court must be governed chiefly by undeniable and leading facts, if such exist in the case.

3. SAME—VESSEL IN SINKING CONDITION.—That a vessel was in a sinking condition, and soon afterwards went down, being heavily loaded with stone, may well be inferred from the fact that there is no evidence of her having been seen by any one since the night of the collision, although the place of the disaster was one where vessels were constantly passing.

4. SAME—VESSEL IN DESPERATE CONDITION.—Where a vessel injured by a collision is abandoned by her crew and afterwards lost, it is enough to prove that her condition at the time appeared to be desperate.

5. SAME—CONVERSATIONS WITH CREW—EVIDENCE.—Conversations with the crew of the lost vessel, subsequent to the collision, are entitled to little weight as testimony in determining disputed questions of fact appertaining to the navigation of the respective vessels.

*The Empire State,* 1 Ben. 19.

*Washington Gilbert,* for libellants.  *Webb & Haskell,* for claimants.

Fox, D. J.  This collision took place about half past nine on the evening of the fourteenth of July last, about three miles south-east of Thatcher's island. The Freddie L. Porter is a three-masted schooner of 349 tons, and was light, bound from Boston into the Kennebec river for a cargo of ice. The Hope is a flat-bottomed, center-board sloop, 42 tons, was loaded with stone, and bound from Cape Cod to Boston. Upon some matters there is more than the usual conflict of testimony between the crews of the respective vessels, and the court has found great difficulty in arriving at a satisfactory conclusion upon the questions thus in controversy. Three of the crew of the Hope are Swedes, one is a Russian, but they all understand our language, and were present in court as witnesses. All of the witnesses in behalf of the Freddie L. Porter are Americans. The witnesses on both sides appeared to be of more than the ordinary intelligence of persons in their position, and all but the mate of the schooner gave their testimony frankly, and without any apparent bias or prejudice, and the court discovered nothing in the appearance or behavior of the other witnesses on either side which should cause any distrust of their statements.

There are some matters upon which both parties agree, and these afford considerable assistance to the court in disposing of the cause. It is admitted by both sides that it was a clear,

moonlight night; that there was but very little sea; that there was about a three-knot breeze, the wind being S. W. by S. or S. S. W., and that each vessel had in place the lights required by law. It is also conceded that the schooner was running free, wing and wing, and that at the time of collision the sloop was close-hauled on her starboard tack. Upon such a state of facts, unless the sloop had shortly before that changed her course, there can be no question if a collision occurred that the schooner would be in fault, and it is therefore claimed in the schooner's behalf that just before the collision the sloop did change her course from the port to the starboard tack, and thereby run across the schooner's bow and caused the collision. The mate and two men were on the schooner's deck, the mate, as he says, being on the lookout, he not being willing to leave that duty to the seamen, as they had joined the vessel that day and he had had no experience of their capacity. The testimony of the mate is that when he first discovered the sloop she was ahead, from an eighth to a sixteenth of a mile off; that he saw both of her lights, and that she was then on her port tack, heading W. by N., the schooner heading N. E. by N.; that he ordered the schooner's wheel hard a-port, which was done, and he then saw the sloop's port light three points on their port bow. The wheel was then righted and the schooner put on her course, about E. N. E. Between the time he first saw the lights and the time he shut in the green light he may have gone one or two hundred yards. That he then ran aft to slack the boom tackle and let the mainsail over, but when he had gone 30 or 40 feet he turned round, and saw the sloop had tacked. Saw her green light. Gave orders to port the wheel again, which order was complied with. They were then going about a knot and a half. That he looked over the schooner's bow but saw no one on the sloop's deck, and heard no hail from her. The two seamen who were in the mate's watch have not been examined as witnesses, as they deserted the schooner on the next day after her arrival.

The testimony of the mate of the schooner is that when he first discovered the sloop he saw both of her lights, and she

was on her port tack, on a course from which no danger
could arise, and that she held this course up to the time he
left the lookout to run aft; that after going only 30 or 40
feet, and before reaching the boom tackle, he turned and
looked forward, and found that in this short space of time
the sloop had come about on the other tack so that her green
light was visible.

Some testimony has been offered, from parties quite com-
petent to give an opinion, that it was possible for this sloop,
under the circumstances, to have completed her tack in this
short time; but this is denied by other witnesses equally
qualified, and the doubt which was entertained and expressed
at the hearing upon this point has not been entirely removed
from the mind of the court. The mate (page 73) says: "The
sloop was ahead of us; when we first saw her she was stand-
ing W. by N., as he judged, from one-eighth to one-six-
teenth mile distant, schooner heading N. E. by N. I then
saw both lights of the sloop. Schooner's course was changed
to E. N. E., when we shut in the sloop's green light." This
statement, in the opinion of the court, is incredible, as it
is admitted the sloop's lights were in conformity to act of
congress. The sloop being ahead, one-eighth, to one-six-
teenth of a mile distant, the starboard or green light of the
sloop would not be visible on board the schooner, as all
all of the forward part of the sloop, with the in-board screen,
would intervene between the green light and the schooner.
The answer does not sustain this statement of the mate, as
the allegation there found is "that the mate discovered the
red light of the vessel crossing the schooner's bows." No
suggestion is made that both lights of the sloop were ever
seen at the same time from the schooner.

There were two men on the deck of the Hope, their watch
beginning at 8 o'clock. One of them kept the wheel from 8 to
9, the other being on the lookout. At 9 they changed posi-
tions. The man at the wheel testifies that he tacked a few
minutes after 9. Before that they were on the port tack, and
afterwards continued on the starboard tack until the time of
collision; that he saw the time by the clock, which was along-

side of the binnacle; that he saw the schooner when he was on the watch, and also after he took the wheel; that the sloop was close-hauled; the schooner was coming right towards us; that he twice made outcries, and the man on the lookout also hailed the schooner, but they got no reply; that when he made the last tack they were about a couple of miles to the leeward of the schooner; that the schooner struck them with her cutwater, breaking in two deck plank and two on her side. The schooner's jib-boom went through the mainsail of the sloop, and her stern was pressed down under water, so that witness was knocked overboard and the water rushed into the cabin and hold. On cross-examination he stated that he took the wheel at just 9, and had been there but a few minutes when he tacked; that he made but one tack while at the wheel, and had been there about half an hour when the collision occurred. Sunman, the other seaman who was on the sloop's deck, says that they had been on the starboard tack 25 or 30 minutes before the collision, and that he was on the lookout all the time. There are two other witnesses from the sloop who testify that they were called on deck by the hail from their vessel, and that when they came on deck the schooner was quite near and the collision was in a very short time.

The statement of the mate of the schooner that the sloop thus tacked just before the collision, and was thereby the guilty party, is thus directly contradicted by the two men who were at the time on the sloop's deck, and who swear that they tacked 25 minutes before the collision. These two men certainly had the best opportunity to know the truth of this matter, and courts of admiralty are generally inclined to accept the statements of a crew as to the movements of their own ship rather than those coming from those on board the other vessel. *The Empire State*, 1 Ben. ——. The probabilities are much in favor of the sloop. It would hardly be expected that when the vessels were so near that a change of course would expose them to danger, that those in charge of the sloop, who are experienced seamen, would thus willingly expose themselves to so great risk. The mate's statement as to

the change of course by the sloop is of a suspicious character, and, as before intimated, the court is not quite satisfied that the change could have been accomplished while the mate was running a distance not exceeding 50 feet. I believe, however, that the mate testifies truly when he admits that he saw the sloop on her port tack, but I fear that he designedly misrepresents the time when it occurred. He went on the lookout at 8 o'clock, probably saw the Hope shortly after, and discovered that she was on her port tack. There were other vessels in the vicinity, and I suspect that he neglected to keep a watch of the sloop and failed to mark her course, and did not notice the time when she tacked. Through his neglect the vessels came in contact, and in excuse of his negligence he is quite ready to insist that the change of course was made by the sloop shortly before the collision, rather than a half hour previously, as those on board the sloop state it to have been.

It thus becomes a question of time, merely, how long before the collision the sloop changed from port to starboard; her crew insisting that 25 minutes had elapsed, while the others place it at only four or five. Probably neither party is exactly accurate; but the mate, as I think, by his statement has much reduced the time which elapsed, and I therefore hold that when the sloop went about on the starboard tack the vessels were so far apart that, with proper diligence and attention by those in charge of the schooner, and a compliance by them with the rules of navigation as prescribed by congress, this collision would not have taken place. The schooner was in fault, and is to be held chargeable for the disaster. The question still remains as to the extent of the damages sustained by the sloop. Upon this there is a much greater diversity of testimony than is found as to the cause of the collision. The court, therefore, must adopt the rule laid down in the case of the *Great Republic*, 23 Wall. 20, "that in cases of collision, where there is a great conflict of testimony, the court must be governed chiefly by undeniable and leading facts, if such exist in the case." In the present case the claimants insist that but little damage beyond tearing her mainsail was done to the sloop; that before the vessels came in contact

her crew, from cowardice, abandoned her to her fate,—all but one climbing on board the schooner by her bob-stays, and that he escaped in the boat and rowed up in her along-side the schooner, and thus came on board,—and that they refused to return to her after the vessels were separated; that the sloop was not leaking badly, as the crew well knew; that the cook of the schooner, having gone on board the sloop to lower her sails afterwards, went all round her deck and into the cabin, and found no water in her; and that two of the crew of the sloop went to her in their boat to take off the cook, and one of them went down into the cabin at the time and brought away a large amount of clothing; and the master of the schooner states that when the crew of the sloop left his vessel in their boat they rowed off in the direction of Thatcher's island and away from the sloop, and that afterwards, for more than an hour, the sloop's masts were seen by those on board the schooner.

The crew of the sloop all testify that they were on her deck when she was struck by the schooner; that she was pressed down so that the water came up on deck as high as their armpits, pouring into the cabin and hold; that her planks were crushed in, and the water poured into her in a large stream; and that the three only abandoned her and went on board the schooner when they found the sloop in a sinking condition; that they took with them at that time all the clothing that was saved; and that when they went in the boat to the sloop to bring off the cook of the schooner neither of the men left the boat, and no clothing was taken at that time from the sloop's cabin; and, finally, that when they all left the schooner in their boat they rowed near the sloop, saw that her deck was under water, and remained near her for about 20 minutes, when she sank, and this is sworn to have been her fate by all four of her crew. While these conflicts are so great that it is impossible to reconcile the statements, there are other facts which go far to establish the claim that the sloop was so greatly injured that she became a total loss. The schooner was more than eight times as large as the

sloop, and was sailing somewhat faster. She was high out of water, while the sloop's deck was nearly on a level with it.

The chain bobstay of the schooner was parted at the time near the cut-water, and her topmast was broken, so that it came down with the topsail. So great damage could not have been sustained unless these vessels had come together with considerable violence, and it is unreasonable to suppose that the schooner was the only sufferer. It is much more likely that this small, low craft was crushed down by the larger vessel, and that her weight, when thrown upon the sloop, must have forced her under water, and broken in her deck and sides, as stated by her crew, causing her to leak badly. It is possible that the leak might have been stopped, so that she could have been taken into Rockport; but the wind was in an opposite direction, her mainsail was useless, and, if she had run before the wind, she must have gone to sea, instead of making a harbor. That she was in a sinking condition, and soon afterwards went down, being heavily loaded with stone, may well be inferred from the fact there is no evidence of her having been seen by any one since that night, although the place of the disaster was one where vessels are constantly passing.

. In *The Rebecca*, 1 B. & H. 347, Judge Betts held "that where a vessel injured by a collision is abandoned by her crew and afterwards lost, it is enough to prove that her condition at the time appeared to be desperate." Applying this rule to the present case, the libellants have established their right to recover the value of their vessel. "In coming to this conclusion I have attached little or no importance to the great mass of testimony introduced into this case relating to conversations with the crew of the sloop after the accident. This description of testimony, although often found in actions for collision, has in most cases been held by the court to be entitled to little weight in determining disputed questions of fact appertaining to the navigation of the respective vessels." *The Empire State*, 1 Ben. 19.

Decree for libellants. Albert Maswick appointed assessor.