THE GEORGETOWN.   THE SALISBURY.   THE BARGE NO. 5.

(District Court, E. D. Virginia.   February 23, 1905.)

1. COLLISION—STEAM VESSELS MEETING—BURDEN OF PROOF.

The burdened vessel, having been found chargeable with faults sufficient in themselves to account for a collision, has the burden of proving that they could not have caused or contributed to it, and every reasonable doubt is to be resolved in favor of the other vessel.

2. SAME—BURDENED VESSEL—STEAMSHIP AND TUG WITH TOW.
   A steamship meeting a tug incumbered with a tow is under the duty of keeping out of the way and avoiding any risk of collision.

3. SAME—EVIDENCE CONSIDERED.
   A steamship, which, having met and passed a tug with a barge in tow, on a line, in the Elizabeth river, at a distance of 300 feet, immediately stopped and reversed, throwing her stem around across the course of the barge, resulting in a collision, *held* solely in fault therefor, not only because the evidence failed to sustain her contention that the movement was justified by a sheering of the barge toward her, rendering it necessary, but also because she failed to give notice by signal, as required by article 18, rule 3, and article 28, of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 100, 102 [U. S. Comp. St. 1901, pp. 2882, 2884]); it further appearing that there was ample room in the channel for her to have kept further away.

4. SAME—FAILURE TO CALL WITNESSES.
   Where the evidence in favor of one of two vessels in collision largely preponderates, including the testimony of disinterested witnesses, the failure of the other to call members of her own crew who were in a position to know the facts is a circumstance entitled to be considered against her.

   [Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 258.]

5. SAME—INITIATING PASSING AGREEMENT.
   The fact that a tug with a tow, on meeting a steamer, gave the first passing signal, does not make the steamer the privileged vessel.

In Admiralty. Cross-libels for collision.

Thomas H. Willcox and Floyd Hughes, for tug Salisbury and Barge No. 5.

Hughes & Little and Butler, Notman, Joline & Mynderse (Archibald G. Thacher, of counsel), for the Georgetown.

WADDILL, District Judge. These are cross-libels filed by the New York, Philadelphia & Norfolk Railroad Company, owners of the steam tug Salisbury and Barge No. 5, against the steamship Georgetown, owned by the Atlantic Coast Steamship Company, and the last-named company against the said tug and barge.

On the morning of the 22d of September, 1903, about 7 o'clock, the tug and barge—the latter loaded with freight cars—en route from Port Norfolk to Cape Charles, Va., came into collision in the Elizabeth river, at a point about opposite the Norfolk & Western Railroad Company's coal piers, with the Georgetown, an ocean steamship proceeding to said piers for the purpose of coaling. The tug and barge, upon coming out of the channel leading from Port Norfolk into the main channel of Elizabeth river, and shaping their course down the river, sighted the steamship coming up the river below the piers, near Black Buoy No. 11; and thereupon the Salisbury gave two blasts of her whistle, to which the Georgetown replied with two blasts of her whistle, indicating to each other that the vessels would pass starboard to starboard. They did pass under this signal, the Salisbury and Georgetown passing each other about 300 feet apart. The navigators of the Georgetown observed, as they claim, that, as the Salisbury's bow was abreast of their starboard beam, a sudden sheer was made by the barge to eastward, which tended to take it across the Georgetown's course, whereupon the Georgetown stopped and reversed her engines, the effect of which was

to throw her bow to starboard, immediately across the course of the barge, and in that way came in collision with the barge; the apron on the starboard corner of the barge striking the port bow of the Georgetown, causing her serious injury; and the barge was also damaged, but to a much less extent. The Georgetown insists that the maneuver made by her was the proper one to avoid a collision, whereas the barge denies that there was any sheer or change in her course; insists that she was following straight in the wake of the tug, and that the collision was solely the result of mistake on the part of the Georgetown's navigators in failing to keep her course, and out of the way of the barge, and in going to starboard, thus throwing her directly across the course of the barge.

The case turns entirely upon what is the correct statement of facts relative to the navigation of the two vessels at the moments indicated—that is to say, the version of which navigator is to be accepted; there being between the witnesses who saw and observed the collision a positive conflict as to what occurred. If there was no sheer on the part of the barge, confessedly the maneuver of the Georgetown was wrong, since she put herself immediately across the barge's bow; and, if there was such sheer on the part of the barge, the Georgetown should not have made this maneuver unless it was the only chance of escape, and in that event it should have given proper reversing signals, as required by statute. Her proper course was to have kept out of the way of the barge, by starboarding and going further away from her, instead of reversing her engines, which threw her nearer to the barge, and across her course, instead of away from it; and if it resorted to the maneuver that it made, it should only have done so upon being satisfied that an avoidance of the collision otherwise was impracticable.

An unusually large number of witnesses were examined before the court in this case, particularly in behalf of the tug and tow; and, without reviewing the evidence at great length, or attempting to reconcile the conflict therein, further than to say that the same has been fully considered, the conclusion reached by the court is that the collision was brought about solely by the negligence of the navigators of the Georgetown. The tug and tow, by an overwhelming preponderance of evidence, established that the barge did not make the sheer ascribed to it by the Georgetown's navigators, but, on the contrary, that it followed straight in the wake of the tug. The witnesses on behalf of the tug and tow consisted of the officers and crews of the two vessels, the officers and crews of vessels near by and of persons on the piers of the Norfolk & Western Railroad Company, all in full view of, and who observed the collision. They with one accord sustain the contention of the tug and tow; and against it was only the evidence of the Georgetown's master and mate, and the master of the tug Katie, then lying near by the Georgetown for the purpose of docking her. Moreover, the circumstances of the collision strongly support the contention that the barge did not sheer as claimed. There was nothing to cause it to do so at the time, either in the condition of the tide or wind, or the length of the hawser; and the lick of the collision—the apron of the starboard of the barge coming into collision with the port bow of the steamship—would clearly indicate that there was no sheer, and that

the barge at least was not heading to the eastward of the channel at the moment of collision, as would have been the case, had such sheer taken place. However much the navigator of the barge, after observing the danger of the collision, may have put his helm to starboard, with a view of lightening the blow, it could not have materially affected, within the time allowed, the course of the barge, if the same was taking the rank sheer indicated by the navigator of the Georgetown. There was no claim of fault on the part of the navigator of the tug, the same having passed the Georgetown upon proper signals, and at a safe distance; and the sole negligence attributed is the sudden sheering of the barge, as above indicated. This defense savors too much of that generally made against the vessel having the right of way, namely, that she failed to remain in a place of safety, and threw herself immediately into danger, which is always improbable. It is further contended, as an act of negligence, that the hawser of the barge was too long. The preponderance of the evidence is that the barge was on a hawser about 100 fathoms, which, in the opinion of the court, was unnecessarily long for the navigation of the waters within the harbor of Norfolk and in the Elizabeth river; but the same in no manner contributed to this accident, and should not serve to relieve the Georgetown from responsibility. The Georgetown on the occasion in question was the vessel on whom the burden rested to avoid the collision; and, she having been found guilty of faults sufficient in themselves to account for the collision, the burden is upon her to show that her negligence not only did not probably produce, but could not have contributed to, the collision, and, under these circumstances, cannot escape liability by the suggestion of possible negligence on the part of the tug and tow. All reasonable doubts as to the vessel at fault must be resolved in favor of the tug and tow, and they held not contributing to the collision, unless their negligence is clearly established. City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186, 197, 15 Sup. Ct. 804, 39 L. Ed. 943; The Victory & Plymouthian, 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519; Foster, Master, v. Merchants' & M. T. Co. (D. C.) 134 Fed. 964.

Counsel for the steamship contends that there was no fault in her navigation, and that what she did at the time was the only safe and proper thing to do, and that it would have been entirely unreasonable to suppose that she would have so acted unless the same had been her only means of escape from impending danger arising from the barge's sheer. The question of reasonableness of the steamship's maneuver is at last a difference of opinion. Doubtless the master thought it was the proper one to make, but the evidence and circumstances strongly establish the fact that his mind was on docking his vessel for coal (the tug Teaser, having shortly theretofore passed immediately around the Georgetown's bow, between her and the Salisbury, was then on his starboard side, with a view of taking his ship into the dock), and that his purpose in stopping his steamer and going to starboard was rather with the view of being backed in to the coal piers by the tug, than from the necessity of escaping this collision. Certain it is, what he did was consistent with the act of docking, instead of escaping the collision. The channel at the point of collision was about 800 yards wide, and,

while the preponderance of the evidence is that the point of collision was to the westward of mid-channel, it was certainly about the middle of the channel, and, if not to the westward, little if any to the eastward thereof, so that the Georgetown, having passed the Salisbury while the vessels were 300 feet apart, had the entire eastward portion of the channel to navigate, if she had proceeded on her course, keeping in view the obligation to keep out of the way of the tug and barge, an incumbered vessel; and there was no good reason, upon their passing the Salisbury, 300 feet away, when the master of the Georgetown says he observed the sheer in the course of the barge, why he should not have put her wheel hard astarboard, and kept out of the way of the barge. The tug and tow were incumbered vessels; and the duty was imposed upon the steamship, having full control of its own movements, to keep out of their way, and, if needs be, in order to avoid collision, to slacken speed, stop, or reverse her engines. The Syracuse, 9 Wall. 672 (5) 19 L. Ed. 783; The Alabama, 114 Fed. 214, 217, and cases cited; and same case, 61 C. C. A. 238, 126 Fed. 336. The Georgetown should have done more than that—she should have avoided the risk of collision; and, if 300 feet was too close to have passed to the Salisbury, taking into account the tow attached, with the incident risk of navigation, she should have kept further away, and, under the circumstances, not have proceeded in such close proximity to the tow that she could not escape collision with the same, arising from sudden, unforeseen, and unanticipated whims of navigation, as claimed by her—particularly when there was ample room, and no weather conditions or other cause to prevent her from so doing. The avoidance of the risk of collision was the duty imposed upon the Georgetown, and this it has clearly failed to meet. The New York, 175 U. S. 187, 201, 207, 20 Sup. Ct. 67, 44 L. Ed. 126; Steamship Co. v. Low, 112 Fed. 161, 162, 172, 50 C. C. A. 473; The Richmond (D. C.) 114 Fed. 208.

Another theory that strongly supports the contention of the tug and tow that the Georgetown's maneuver was with a view of backing into the coal piers, rather than seeking to avoid immediate collision with the tow, is the fact that the Georgetown utterly failed to give the danger signals required of her by article 18, rule 3, and article 28, of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 100, 102 [U. S. Comp. St. 1901, pp. 2882, 2884]), if her purpose was to stop and reverse in order to escape this collision. Of course, if she slowed down, and came to a standstill, with the view of being taken in to the dock, she would not have given these signals. Her failure so to do in the emergency is strongly indicative of the circumstances under which she stopped, and goes to sustain the tug and tow's theory. This rule in reference to danger signals in case of reversal of steam vessels is an important one to be observed, and it cannot be said that it may not have entered into the causes of this collision, while the other faults were the real causes; non constat that the tug, in its effort to control its tow, and those in charge of the navigation of the barge, would have adopted a different course, had they supposed that the steamship thought there was an emergency arising from the fault of the barge, taking the sheer ascribed to it. The enforcement of this rule is imperative where steam vessels reverse their engines and move backwards, even with a view of avoid-

ing a collision. The Dexter, 23 Wall. 69, 23 L. Ed. 84; Belden v. Chase, 150 U. S. 674, 699, 14 Sup. Ct. 264, 37 L. Ed. 1218; The Straits of Dover, 120 Fed. 900, 58 C. C. A. 86.

Considerable discussion was had as to the character of the witnesses who testified for the respective vessels, and the Georgetown was sharply criticised for only producing out of her crew, consisting of over 20 members, her master, mate, and chief engineer, and the omission to call the lookout or wheelman. Confessedly, the witnesses in charge of navigation of the respective vessels, by reason of their position and experience, are best enabled to explain what took place at the time on their vessels, and their evidence is entitled to great weight. The Hope (D. C.) 4 Fed. 93; The Empire State, 1 Ben. 60, Fed. Cas. No. 17,586; Gypsum Prince, 67 Fed. 612, 14 C. C. A. 573; The Richmond (D. C.) 114 Fed. 208, 211. But when they are in direct conflict, or there is a greater preponderance of the evidence of those on the vessels on one side than on the other, and, in addition, either side has the support of disinterested witnesses, in a position to observe and see all that occurred, the fact that the evidence of those engaged in the navigation of the vessel in collision preponderates strongly as to the cause of the collision, and is likewise supported by large numbers of disinterested witnesses, is of peculiar significance and strength; and, under such circumstances, the failure of the ship against which the weight of evidence exists to produce all of the persons, at least among its own officers and crew, likely to know of the circumstances of the collision, necessarily weakens its case. The failure to produce witnesses under such circumstances may be the result of mishap or misfortune, but these cannot suffice to take the place of absent witnesses who should have been produced. Clifton v. U. S., 4 How. 242–246, 11 L. Ed. 957; The New York, 175 U. S. 204, 20 Sup. Ct. 67, 44 L. Ed. 126; The Freddie L. Porter (C. C.) 8 Fed. 170; The Fred M. Laurence (D. C.) 15 Fed. 635; The Alpin (D. C.) 23 Fed. 815; The Bombay (D. C.) 46 Fed. 665.

Counsel for the Georgetown suggests that, the tug having initiated the movement of the vessels on this occasion by giving the first passing signals, thereby the greater responsibility of carrying out the same rested upon her; citing The George L. Garlick (D. C.) 91 Fed. 920. Whatever there may be in this contention, it should not prevail in this case, to relieve the Georgetown from responsibility, since the Salisbury and Georgetown passed each other with entire safety, and at a reasonable distance apart; and to carry this doctrine to the extent of relieving the Georgetown from responsibility in this case would, in effect, be to place it in the position of being the favored vessel, as distinguished from the tug and tow occupying such position by reason of its incumbered condition, merely because the tug and tow first gave the passing signal.

It follows from what has been said that, in the opinion of the court, the collision occurred solely because of the fault of the Georgetown, and a decree may be entered so determining.