THE HESPEROS.

THE ARETHUSA.

(District Court, E. D. Virginia. May 11, 1918.)

1. COLLISION ⬦⟜71(1)—TOW—FAULT.
    Where an outward bound steamer anchored on the eastern side of the
    channel of the Elizabeth river at Norfolk, Va., and a tug following with
    barges in tow proceeded to. the west side of the channel, though a steam-
    er was incoming, held that, as the tug and incoming steamer agreed on
    a starboard to starboard passage, the tug was not at fault, though the
    incoming vessel struck the anchored vessel and also injured the tow.

2. COLLISION ⬦⟜71(3)—ANCHORED VESSEL—FAULT.
    Though a vessel anchored to take on dynamite within harbor limits
    in violation of the harbor rules, yet, where the vessel had taken on no ex-
    plosive before the collision occurred, the purpose for which it anchored
    does not place it at fault.

3. COLLISION ⬦⟜71(3)—ANCHORAGE—FAULT.
    An outbound vessel which anchored on the eastern side of the chan-
    nel of the Elizabeth river at Norfolk, Va., without permission of the
    harbor master, etc., though it violated harbor rules and Act March 3,
    1899, § 15 (Comp. St. 1916, § 9920), held not at fault for a collision with
    an inbound vessel, where the anchorage was in deep water, extending out
    beyond the channel to the eastward, and a sufficient channel for in-
    coming vessels remained.

4. COLLISION ⬦⟜71(2)—LIABILITY—VESSEL AT FAULT.
    A government steamer inbound through the channel of the Elizabeth
    river, at Norfolk, Va., held at fault for a collision with an outbound ves-
    sel anchored on the eastern bank of the channel; it appearing that the
    inbound vessel imprudently attempted to pass between the anchored ves-
    sel and a tug and her tow on the other side of the channel.

In Admiralty. Libel by the United States against the steamship
Hesperos, with petition by G. Sandaa, master of the steamship Hes-
peros, against the E. I. Du Pont De Nemours Powder Company, and
another, consolidated with libels by the New England Coal & Coke
Company and by the Hesperos against the United States, as owner
of the steamship Arethusa, together with a petition by the United
States against the steamship Hesperos. Decree against the United
States, as owner of the steamship Arethusa.

Richard H. Mann, U. S. Atty., of Petersburg, Va., and Hiram M.
Smith, Asst. U. S. Atty., of Richmond, Va., for the United States.

Hughes, Little & Seawell, of Norfolk, Va., for The Hesperos and
petitioner G. Sandaa.

Edward E. Blodgett and Blodgett, Jones, Burnham & Bingham,
all of Boston, Mass., for New England Coal & Coke Co.

Hughes & Vandeventer, of Norfolk, Va., for Lambert's Point Tow-
boat Co.

Edward R. Baird, Jr., of Norfolk, Va., for E. I. Du Pont De
Nemours Powder Co.

WADDILL, District Judge. On the morning of the 18th day of
October, 1915, between 7 and 8 o'clock, a collision took place between

⬦⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the United States ship Arethusa, inward bound, the Hesperos, anchored on the eastern side of the channel of the Elizabeth river, opposite Craney Island Light, Norfolk, Va., and the barges Emilie and Cassie, being two of a tow of three barges then proceeding down the river on the western side of the channel, under the following circumstances:

The Hesperos, a large ocean going steamship, 389 feet long, 54 feet beam, and 24.6 deep, having loaded part of her cargo at the piers of the Norfolk & Western Railway Company at Lambert's Point, was taken out from the pier by the tug Pocahontas, of the Lambert's Point Towboat Company, and proceeded down the river to a point just below Craney Island Light, for the purpose of loading a consignment of dynamite, which was then on a barge at anchor on the flats, to the eastward of the place at which the Hesperos came to anchor. The Hesperos was followed down the channel by the tug Gwalia, towing three barges, lashed together, on a hawser of 25 to 30 fathoms. The tide was ebb, the weather good, and practically no wind. The tug and tow navigated to the western side of the channel, upon the Hesperos making its departure for the eastern side. The Hesperos was anchored over as close to the bank on the eastern side as she could get, and, with the ebb tide, her stern swung slowly to the westward, coming round to the tide; her engines being kept slow ahead, for the purpose of keeping her bow to the bank of the channel. After being anchored, the Arethusa, 330 feet long, 43 feet beam, and drawing 23 feet of water, was observed coming up the river below Boush Bluff, a mile or more away, about midchannel, and apparently at full speed. The Arethusa and the tug Gwalia exchanged passing signals of two blasts of their whistles, indicating a starboard to starboard passage.. The Arethusa approached the Hesperos, with apparently no change of helm or speed, and the Hesperos sounded danger signals, which the Arethusa did not hear. The Arethusa, according to her master's testimony, maintained her course and speed, running, until a short time before the collision, at half speed of from five to six knots an hour, and immediately before, and at the time of the collision, had slowed down to slow speed of between three and four knots an hour, and, when within two ship lengths from the Hesperos, she put her wheel hard aport, with a view of going to starboard, but not in time to avoid coming into collision with the Hesperos, striking the stern of the latter ship on her port quarter, doing considerable damage to that ship, and seriously injuring herself, tearing away, among other things, the ship's bridge, steering gear, etc. The Arethusa then swung abruptly to starboard, ran some 600 to 800 feet over to the westward side of the channel, and into the easternmost of the three barges, the Emilie, sinking her, and driving with such force against the second barge, the Cassie, as to cause it considerable damage.

The original libel was filed by the United States against the Hesperos; the latter ship answered this libel, and also by petition under the Fifty-Ninth Admiralty Rule (29 Sup. Ct. xlvi) brought in the E. I. Du Pont De Nemours & Co., the charterers of the Hesperos, and

the Lambert's Point Towboat Company, owner of the tug Pocahontas, which anchored the Hesperos. The Lambert's Point Towboat Company and the E. I. Du Pont De Nemours & Co. filed their respective answers to this petition. The Hesperos also filed an independent libel against the United States, the owner of the steamship Arethusa, as did also the New England Coal & Coke Company, the owner of the barges in collision. The United States filed its answer to these two libels, and also by petition brought in the Hesperos in the New England Coal & Coke Company case, to which petition the Hesperos filed its answer, and by consent of parties the several cases were heard together. It is perhaps proper that the court should here state that the litigation was inaugurated pursuant to an act of Congress approved April 26, 1916 (chapter 87, 39 Stat. 1261), entitled "An act for the relief of New England Coal & Coke Company, owner of the American barges Emilie and Cassie, and Bruusgaard, Kiosterud Dampskibsaktieselskab, owner of the Norwegian steamship Hesperos," by which the United States magnanimously assented to the determination of the loss arising from the collision in question, by the owners of the Emilie and Cassie, and the owners of the steamship Hesperos, in litigation to be instituted by the United States, the owner of the Arethusa, in an admiralty suit in the proper District Court of the United States, and by the act jurisdiction was conferred upon said court to hear and determine the whole controversy, and enter judgment, and decree for damages sustained by reason of such collision, if any, either for or against the United States, upon the same principles and measures of liability, and with the same costs, as in like cases in admiralty between private parties.

The several libels, cross-libels, and petitions growing out of the collision between the four vessels, were, by consent, heard together, and present for determination the question upon whom the liability should fall for the disaster. The contention of the Hesperos that she should be absolved from liability, and that the Lambert's Point Towboat Company, whose tug took her out from the piers, and located her at the scene of the accident, or the E. I. Du Pont De Nemours & Co., the charterers of the Hesperos, and owners of the cargo, under whom the towboat company was acting, as claimed by her, should be held responsible, is not well taken, under the facts and circumstances of this case.

The elimination of these two companies leaves for ascertainment the liability, as between themselves, of the Gwalia and her tow, the Hesperos, and the Arethusa, which will be considered in the order named.

[1] First. Upon the testimony in this case, fault alone, if any, can be imputed against the Gwalia and her tow, for violating the narrow channel rule by navigating on the westward, instead of on the eastward, side of the channel.

The court's conclusion is that they were not negligent in this respect, under the circumstances of this case. In going down the channel, they first followed the Hesperos, a large ship, and upon her directing her course to the extreme eastward of the channel, with a

view of anchoring, the Gwalia and its tow directed their course to westward, to avoid possible risk from the maneuver of the down-going ship; and while thus navigating, and after the Hesperos had come to anchor, they gave to the Hesperos two blasts of the tug's whistle, indicating that they would pass the ship on their starboard. To this signal the Hesperos made no answer, and the Arethusa, the up-coming ship, in a short time responded with two blasts of the whistle, indicating that she understood that the two whistles meant a desire on the part of the tug and tow to inaugurate a starboard hand passage with her, to which the Arethusa replied with two blasts of her whistle, giving her assent to such passage. Thereupon the Gwalia replied with two blasts to the Arethusa, which she meant, and the Arethusa understood, as a confirmation of the understanding to pass starboard to starboard; and the tug and tow continued their movement to port, and navigated as far to the westward side of the channel as it was prudent to go, when the Arethusa, having suddenly collided with the Hesperos, on the eastward side of the channel, sheered to the westward, and ran into two of the barges in tow of the Gwalia, sinking one, and seriously damaging the other. Under these circumstances, it clearly appears that the tug and tow were free from fault, and should in no manner share the loss caused by the collision. The Hesperos, which had anchored on the eastern side of the channel, could certainly not complain of its course to the westward of the channel, and the up-coming steamer gave its full assent to the navigation proposed by the Gwalia.

[2] Second. This brings us to the consideration of the Hesperos' conduct, and her liability for the consequences that followed.

This ship was at anchor at the time of the collision between herself and the Arethusa, as well as at the time the latter ship collided with the barges Emilie and Cassie. It is earnestly insisted by the United States, the owner of the Arethusa, that the Hesperos was solely at fault for the collision, in that she cast anchor in the channel, also undertook to load dynamite in the harbor, contrary to law and the harbor rules and regulations governing the taking on of explosives, and for coming to anchor, and that at least she was partly to blame for the collision, because of negligent navigation in connection with her anchorage, at a time when it was too late for the Arethusa to so change her course as to escape the consequences of her alleged unseamanlike conduct.

There is force in the government's contentions in these respects; but, so far as the loading of dynamite is concerned, it did not affect the collision, further than that the ship came to anchor at the place in question to take on dynamite, which was stored upon barges on the flats in that vicinity. The dynamite, however, was not taken on by the Hesperos, and the alleged violation of the local ordinance in that respect does not become material.

[3] The place of anchorage is one of more difficulty. The harbor rules unquestionably contemplate anchorage in the harbor only upon permission of a harbor master, and that the same shall not be in the channel; but obtaining permission of the harbor master

seems to have become obsolete, if ever enforced. The rule forbidding anchorage in the channel is as follows:

"5. Vessels entering the harbor and intending to come to anchor or dropping out of wharves or docks preparatory to departure, must anchor under direction of a harbor master, and are forbidden to anchor in the channel"

—and should be read in the light of the national legislation on that subject. Act March 3, 1899, c. 425, § 15, 30 Stat. L. 1152 (Comp. St. 1916, § 9920). These regulations, and the act of Congress were set forth and fully considered by this court in the Margaret J. Sanford-Strathleven Case (203 Fed. 331, 335, 336, 338, 339); and, while under the decision of this court the government's contention against anchoring in the channel has strong support, still the same was not approved by the Circuit Court of Appeals in that respect (213 Fed. 975, 130 C. C. A. 381), and in the view taken by that court, in that and other cases, the true rule is that Congress, by the act referred to, did not intend absolutely to forbid anchoring in narrow channels, except only at such places as would necessarily prevent the passage of other vessels, or obstruct them in passing, to such an extent as to make the effort to do so a dangerous maneuver; and that vessels anchoring at a point in a channel, where, notwithstanding such anchorage, other vessels navigating with the care the situation required, can safely pass, neither violates the statute, nor renders a vessel liable under the general rules applicable to navigation, although she may to a certain extent obstruct the channel.

Assuming this to be the law applicable to the Hesperos' anchorage, which this court must do, since the very act of Congress and harbor rules and regulations were in question in the Strathleven Case, and it is manifest either that the appellate court treated the inhibition in the local harbor regulation as to anchoring in the channel as substantially the same as that of the national act, or reached the conclusion that the harbor rules in that respect were superseded by the act of Congress on the subject, and placed its own construction upon the meaning and effect of the federal act, diametrically opposed to that of the lower court, still it cannot be said that the Hesperos was at fault in anchoring where she did. She cast her anchor where the deep water really extended beyond the cut channel to the eastward, for a short distance, with a clear deep water cut channel of 600 feet besides; and, while she had undoubtedly swung out under the influence of the ebb tide into and partly across the channel, there is nothing to indicate or suggest that she had taken certainly more than half of the channel, which left ample space for the passing of the up-coming steamer Arethusa, in the exercise of proper care and caution on its part. It is true that the Arethusa claimed that her course was obstructed to the westward by the down-coming tug and tow; but it was not so to such an extent that in broad daylight, calm weather, and slight ebb tide against her, she could not readily have so navigated as to have avoided coming into collision with the Hesperos.

[4] Third. Coming now to the case of the Arethusa, in addition to what has been said in connection with the navigation of the Hes-

peros and Gwalia, it seems to the court quite clear that the Arethusa is liable for bringing about the collision. She was proceeding under most favorable circumstances up the channel, with nothing seriously to obstruct or interfere with her navigation; and the burden was upon her, the free and unincumbered vessel, to keep clear of vessels at anchor, and approaching tugs and tows. She should have so navigated, both as respects her proper place in the channel, her speed, and in everything she did, or reasonably could have done, with that end in view. So far from doing this, she managed, without apparent justification, to come into collision with the Hesperos at anchor on the eastern side of the channel, running at such speed as to severely injure the Hesperos, tearing away most of her own running gear, navigating machinery and appliances, and sheered over to the western side of the channel, a distance of 500 or 600 feet, and ran into the tow, with such force as to sink the Emilie, and seriously cripple the Cassie, two of the barges in the tow, both heavily laden. This would not have happened had the Arethusa been navigating at the speed and with the care required of her under the circumstances. She had seen the anchored ship a mile or more away, and, while it is true she did not at first observe the ship was at anchor, she at least should have discovered she was not approaching. She observed, when she was as much as a quarter of a mile away, that her stern was swinging out into the channel across her bow, and while the Arethusa's navigators claim that they did not see her anchor chain until she was some 300 feet of her, and that she, about that time, swung more rapidly out into the stream, still the court cannot but be impressed with the fact that her exact position would have been, if it was not actually, discovered in ample time to have avoided the collision, by the exercise of reasonable vigilance by the navigating officers of the Arethusa. It seems entirely clear, from the Arethusa's own account of the transaction, that her master thought he had sufficient room to pass between the stern of the Hesperos and the passing tug and tow, and he attempted to do so, when good seamanship, prudence, and the exercise of proper care and caution would have forbidden his so doing. He should have so navigated, at least, as to have been able to keep his ship under easy control at all times, to prevent the happening of just such an occurrence as took place; and certainly he should not have attempted to proceed at such rate of speed as the evidence, and the result of what happened, indicates he was making.

The government's proctor, Assistant District Attorney Hiram M. Smith, who actively conducted the litigation for the United States, ably and earnestly insisted that, assuming the navigation of the Arethusa to have been imprudent, still that no harm would have resulted therefrom, and the disaster would not have occurred, but for the imprudent act on the part of the Hesperos in accelerating the movement of that ship into and across the channel, at a time when it was too late for the Arethusa to avoid the accident, and that this was the sole cause of the collision, or certainly contributed to it, for which the Hesperos should, at least in part, share the burden.

There is force, of course, in this contention. Still, having regard to the law and rules of navigation properly applicable, and due regard to what maritime skill, prudence, and forethought required of the Arethusa, it should not be adopted. The testimony as a whole, in the view taken by the court, does not sustain the position that a sudden acceleration of the movement of the Hesperos materially aided to bring about the accident. It is true the Hesperos was continuing to angle out into the stream, and it may be immediately preceding the accident she moved somewhat faster, but not perceptibly so, save as testified to by those on the Arethusa; still no such close shave as that should have been taken by the Arethusa. The obligation imposed upon her as an unincumbered ship was to avoid as well the risk of collision, as the collision; and she should have properly discharged her duty in this respect, going with the tide against her, in broad daytime, without wind or other conditions to obstruct her, she ought not to have so placed herself in respect to the Hesperos and the Gwalia as to have gotten into collision with them. She voluntarily assented to the proposal of the tug and tow to take her side of the channel, when she knew the Hesperos was on the other side, and knew that she would have to pass between the two; and she should at that time, or certainly later, instead of attempting to pass, have stopped and reversed her engines and sounded danger signals. It is true she did not hear the danger signal from the Hesperos, nor did those on the Gwalia, though doubtless such signals were given, but at a time when the other vessels were too far away to hear them. But that is immaterial here, since the Hesperos was seen in full view when a mile away.

Moreover, the Arethusa should have anticipated the danger arising from unusual or erratic occurrences in connection with the movement of the Hesperos, and not have so navigated as to have become entangled with her upon such conditions happening, either from her own undue speed, or from proceeding in too close proximity to the ship angling out in the channel. The Maryland (D. C.) 182 Fed. 831. The opinion of Mr. Justice Brown, speaking for the Supreme Court, in The New York, 175 U. S. 187, 207; 20 Sup. Ct. 67, 75 (44 L. Ed. 126), is so appropriate that it deserves quotation again, though it has been so often repeated. He said:

"The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn; but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect."

The following decisions from this district: The Richmond, 114 Fed. 208, 213; The Georgetown, 135 Fed. 854, 858; and The Hawkhead, 248 Fed. 780—sustain the conclusions herein reached.

It follows, from what has been said, that the Arethusa is solely liable for the happening of the disaster in this case, and a decree so ascertaining will be entered on presentation.