**GATEWOOD v. SANDERS et al.**

**THE LILLIAN ANNE.**

**THE FAIRWILL.**

**THE SCOW NO. 72–H.**

**R. C. HUFFMAN CONST. CO. v. SANDERS.**

**Nos. 5432, 5433.**

Circuit Court of Appeals, Fourth Circuit.

Dec. 24, 1945.

See also The Fairwill, 56 F.Supp. 887.

Leon T. Seawell, of Norfolk, Va., for Eularia M. Gatewood, owner of the motor vessel Lillian Anne.

R. Arthur Jett, of Norfolk, Va., for R. C. Huffman Construction Co., owner of the scow No. 72–H.

Barron F. Black, of Norfolk, Va., (Vandeventer & Black and Baird, White & Lanning, all of Norfolk, Va., on the brief), for W. S. Sanders, owner of the motor tug Fairwill.

Before DOBIE, Circuit Judge, and CHESNUT and BARKSDALE, District Judges.

DOBIE, Circuit Judge.

These cases involved a libel in admiralty resulting from a collision in Norfolk harbor between the motor vessel "Lillian Anne" and the scow No. 72–H, which was being towed by the tug "Fairwill," lashed to the scow's starboard quarter. The District Court held the "Lillian Anne" to be solely at fault. From this decree the "Lillian Anne" has appealed, while the owner of the scow has appealed from that portion of the decree which absolved the tug "Fairwill" from blame.

As is so frequent in cases of maritime collisions, there are serious conflicts in the evidence as to almost every material feature of these cases. We are here bound by the findings of the District Judge, who saw and heard the witnesses, unless these findings are deemed by us to be clearly erroneous. We cannot so deem the material findings here, so we must affirm the decision below. Hodges v. Standard Oil Co., 4 Cir., 123 F.2d 362; The E. Luckenbach, 4 Cir., 93 F. 841, 842, 843.

The "Lillian Anne" is a motor vessel of 141.5 feet length, 27.1 feet beam, 10.3 feet depth, and a burden of 330 gross tons. The "Fairwill" is a Diesel motor tug of 58.6 feet length, 17.4 feet beam, 8.3 feet depth, a burden of 51 gross tons, with a full Diesel Fairbanks-Morse engine of 210 horsepower. The scow 72–H (light at the time of the collision) is a wooden, flat deck, square end dump scow of 120 feet length, 35.3 feet width and 13.5 feet depth, with a two-foot coaming across each end and down both sides.

The collision occurred about 6:40 A. M. on November 5, 1942. The weather and visibility were then good, the tide was the first of the ebb. The "Lillian Anne" had left the Norfolk Navy Yard, on the Southern Branch of the Elizabeth River, bound for Solomons, Maryland, with 263 officers and enlisted men aboard. Her starting course was almost due North. The "Fairwill," lashed to the scow, left the Craney Island dumping ground bound for a dredge then operating in the Eastern Branch of the Elizabeth River. Her course was generally South, with the necessity of a turn to the East in order to enter the Eastern Branch.

Before the collision, the "Lillian Anne," proceeding under a full speed ahead order, though her engines had not warmed up, was making a speed of at least 4½ miles per hour; Martin, on the "Lillian Anne," admitted a speed of 5 or 6 miles an hour, while the neutral witnesses, Whitehurst and Jones, estimated her speed, the former around 10 or 12 knots, and the latter at 8 miles an hour. Not unimportant here are the force of the impact and the effects of the collision on the scow. The "Fairwill," under one bell, was making about 2 miles per hour. The vessels, we think, were on meeting, not on crossing, courses. Pilot Martin, of the "Lillian Anne," when asked: "What lights did you see on the tugboat when you first saw her?" replied: "Tow lights and red and green." The "Fairwill" appears to have first sighted the "Lillian Anne" off the "Fairwill's" starboard bow, about 400 yards away. The "Fairwill" was seen by the "Lillian Anne" at a much greater distance; pilot Martin estimated the distance at 750 yards.

The "Lillian Anne" gave a one-whistle signal for a port to port passage, to which an assenting signal was given by the "Fairwill." We think this procedure was proper. If, as Captain Gatewood testified, he heard no assenting signal from the "Fairwill," the question immediately arises: Should he have continued at full speed in a crowded harbor? See The City of Chester, 4 Cir., 78 F. 186; Construction Aggregates Co. v. Long Island Railroad Co., 2 Cir., 105 F.2d 1009, 1012. Captain Gatewood admitted that the enlisted men on his boat were "hollerin' and carrying on."

This may well have prevented Captain Gatewood from hearing the assenting signal given by the "Fairwill." We find no merit in the contention that the "Fairwill" should have refused assent to the proposed port to port passage and should have immediately given a danger signal. See The Manhasset, D.C., 34 F. 408; The George L. Garlick, D.C., 91 F. 920, 927. We uphold, too, the finding that the "Fairwill" carried proper lights, both on the tug indicating a tow and also on the scow. The testimony of the neutral witnesses, Whitehurst and Jones, was quite clear on this point. Of course, the "Fairwill," with the tow as the encumbered vessel, was much more difficult to maneuver quickly than the "Lillian Anne," of which fact Pilot Martin of the "Lillian Anne" was duly apprised when he saw the tow lights on the tug over 700 yards distant. See The Georgetown, D.C., 135 F. 854, 858; The Howard Reeder, 4 Cir. 207 F. 929, 933.

It was conceded that neither the "Lillian Anne" nor the "Fairwill" had a lookout. There was violent conflict in the testimony as to the place of the collision and the course of these two vessels just before the collision. The "Lillian Anne" contended that the "Fairwill" was then making her turn to port, which would bring the tug across the "Lillian Anne's" course; while the "Fairwill" contended that this turn had already been made and that Mate Hudgins (navigator of the "Fairwill"), upon receiving the "Lillian Anne's" signal for a port to port passage, immediately, and properly, changed her course to starboard. We cannot disturb the District Court's finding which upheld the contention of the "Fairwill."

Shortly before the collision, the "Fairwill," observing that the "Lillian Anne" was heading in dangerously close to the scow, repeated the one-blast signal in an effort, as the District Judge found, "to get the 'Lillian Anne' to turn further to her starboard, which she had the time and room to do." But the "Lillian Anne" blew a three-whistle signal and put her engines full speed astern; the "Fairwill" did likewise. The "Lillian Anne" had left-handed engines, so the effect of this procedure was to cant the bow of the "Lillian Anne" to port into the course of the scow, while the "Fairwill's" bow swung to starboard away from the "Lillian Anne."

The steel bow of the "Lillian Anne" struck the front end of the scow a short distance from the scow's forward port corner, so that a very slight alteration of the "Lillian Anne's" course would have avoided the collision. Indeed, the District Court found that but for the "Lillian Anne's" cant to port upon the reversal of her engines, "she would probably have cleared the scow."

The impact of the collision caused the crushing of timbers on the scow of a size of 16 inches by 16 inches, while the bow of the "Lillian Anne" penetrated the hull of the scow to a distance of about 4 feet. The crew of the tug cast off the lines between the tug and the rapidly sinking scow to keep the tug from being pulled under and attempted to tow the scow to shallow water; yet the scow sank after being thus towed for about 100 yards. The "Lillian Anne" played her searchlight upon the tug and scow, and then (in spite of the provisions of the Stand-by Act, 33 U.S.C.A. § 367) proceeded on her way without speaking to those on the tug and scow and without any offer of, or attempt at, assistance. See The Lizzie Crawford, D.C., 170 F. 837.

The conclusion of the District Judge that the "Lillian Anne" was solely at fault for the collision was based on several factors. One was her excessive speed in a busy harbor abnormally crowded under war-time conditions. Another was her failure to keep a lookout. The District Judge made a finding that the failure of the "Fairwill" to keep a lookout did not contribute to the collision, in view of the course taken by the "Fairwill" after the "Lillian Anne" was sighted, and this finding, we think, finds ample support in the record. A third was the failure of the navigators of the "Lillian Anne" to see the tow, though it was adequately lighted. See The Transfer No. 8, D.C., 14 F.2d 448; Id., 2 Cir., 25 F. 2d 628. Also the District Judge adverted to the reversal of the "Lillian Anne's" engines just before the collision causing her bow to cant to port; and discussed the general navigation of the "Lillian Anne" after she initiated the port to port passage and failed to take proper steps to effectuate this maneuver safely.

There were, at the time of the collision, no adverse conditions of tide, wind, or weather. The unencumbered "Lillian Anne" could maneuver freely, The Georgetown, D.C., 135 F. 854, 858; there was plenty of water for a boat of her draft outside the channel; nor was there any interference with her movements by the close proximity of wharves or other shore installations.

382

For these reasons we see no ground for disturbing the findings of the District Judge.

The decree of the District Court is, accordingly, affirmed.

Affirmed.