## FOSTER v. MERCHANTS' & MINERS' TRANSP. CO.

(District Court, E. D. Virginia. January 21, 1905.)

**1. COLLISION—TOW AND CROSSING STEAMER—VIOLATION OF RULES.**

A tug picked up two barges which had gone adrift in Norfolk Harbor in the night, and while taking them back to the docks, having one on each side, one of them came into collision with a ferryboat making its regular trip on a crossing course. The tug had the ferryboat on her starboard hand, and was therefore bound to keep out of the way, under article 19, Inland Rules, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883], but did not change her course or speed, nor did she maintain a lookout nor carry proper towing lights, and her side lights were obstructed by the

barges, which did not carry side lights, and probably none at all. *Held*, that such violation of the rules and negligent navigation by the tug, and the absence of the lights required by the inspector's rules from the barges, placed them in fault for the collision, and rendered them solely liable for the damage, in the absence of clear proof of contributory fault on the part of the ferryboat.

2. SAME—TUG WITH TOWS—FAILURE TO CARRY PROPER TOWING LIGHT.

A tug navigating with tows in the night in a harbor did not comply with article 3 of the Inland Rules, 30 Stat. 97 [U. S. Comp. St. 1901, p. 2877], which requires her to carry two bright white lights in a vertical line, one over the other, not less than three feet apart, where, although having two towing lights, they were suspended from either end of a horizontal cross-piece on the flagstaff, about a yard in length, and such failure to observe the rule was a serious fault, which renders the tug liable for damage caused by a collision between her tow and another vessel.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 105–108.]

In Admiralty. Suit for collision.

Whitehurst & Hughes, for libelant.
Hughes & Little, for respondent.

WADDILL, District Judge. This is a libel in personam, filed by the libelant as master, and as such agent of the owners, of the steam ferryboat City of Portsmouth, against the Merchants' & Miners' Transportation Company, a corporation of the state of Maryland, to recover damages sustained in a collision between the said City of Portsmouth and barge No. 21, a house barge used for the transportation of freight in the harbor, the property of the respondents, at the time in tow of the tug Apollo, also owned by the respondent. The collision occurred on the night of the 18th day of September, 1903, about 2:30 a. m., in the harbor of Norfolk. The ferryboat was en route from its slip in the city of Portsmouth to the city of Norfolk, and the tug and tow, consisting of said barge No. 21 in collision, and another house barge, No. 17, of the respondent, was crossing the harbor, and came into collision with the City of Portsmouth. The libelant's charges, in effect, are that the respondent, being the owner of said barges, on the night in question negligently moored them to a pier near the Boston Wharves, in the city of Norfolk, without having a shipkeeper on board; that during the same night, while removing one of its steamships, the Chatham, from one berth to another, at its said Boston Wharf, it negligently and carelessly caused her to collide with the barges thus improperly moored, casting them adrift into the harbor; and thereafter, when the tug Apollo had gone between and made fast to the barges so adrift, and was engaged in their navigation, the tug and tow were so carelessly and negligently navigated as to cause the collision with the City of Portsmouth; and that, among other things, at the time of the collision, there were no proper lights either upon the barges or the tug, nor did they give proper warning of the dangerous condition in which they were, nor keep a proper lookout for vessels approaching them in their then condition, or properly keep out of the way of the said

City of Portsmouth, or slacken speed, stop, or reverse upon approaching the latter steamer. The respondent, while in effect admitting that its steamship Chatham did collide with and break loose the barges as alleged, insists that there was no negligence in so doing or in the mooring of said barges, and that upon the barges being cast loose, under the influence of the flood tide and the strong northwesterly wind then prevailing, they drifted rapidly up the harbor, and were overtaken at the earliest moment by its tug Apollo, which, in the most practical way, made fast thereto, and removed them from the dangerous position in which they then were; and further insists that the tug did have proper lights, was properly navigated, and that, while the barge in collision had no side lights, there was a bright light upon its end; and that the City of Portsmouth was negligent in her navigation, in that she did not keep out of the way of the tug and tow, as it is insisted it was her duty to do, nor seasonably slacken her speed, stop, or reverse, or have a proper and efficient lookout, was proceeding at too rapid speed, and did not discover the proximity of the tug and tow as quickly as she should have done.

One of the questions presented for determination is whether or not the vessels at the time of the collision were on crossing courses, or the City of Portsmouth was an overtaking vessel, as contended for by respondent. The conclusion reached by the court, after full consideration of all the evidence, is that the tug and tow were crossing the course of the City of Portsmouth at the time of the collision, and that the rules applicable to vessels crossing, as distinguished from those of an overtaking vessel, should govern in the consideration and determination of the questions involved in this case. Not only does the evidence of the libelant, which includes, in addition to its officers and crew, three disinterested witnesses who were on the bow of the ferryboat at the time of the collision, sustain this view strongly, but it is supported as well, in the view of the court, by the respondent's evidence. The course on which the vessels were necessarily proceeding at the time of the collision, as shown by the report of the master of the tug, quite clearly sustains this contention. And while the respondent attempts to avoid the effect of this evidence by the character of the injury to its tug, any inference to be drawn from this fact should not overcome the great weight of evidence adduced; and, moreover, the character of the injury may be accounted for in part by the shape of the ferryboat's bow, and the fact that when in the act of collision she caused her wheel to be put hard aport, with the view of lessening the force of the impact as far as possible, and thus avoid cutting down the barge; and the precise angle at which the two boats were when in collision was most likely affected by the fact that the tug was navigating between the two barges, making it a matter of more or less doubt just to what extent the tail of the barge in collision may have been out of line from the course of the tug. Assuming the vessels to have been on crossing courses, the tug and tow having the City of Portsmouth on her own starboard side, it was the plain duty of the tug to have kept out of

the way of the ferryboat, and at least not to have attempted to cross ahead of her, and, if needs be, to slacken speed, or stop or reverse, and pass astern of the ferryboat; and the latter was required to keep her course and speed (articles 19, 21, 22, 23, of the Inland Rules of Navigation, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), unless there existed certain exceptional reasons for not so doing, as shown by article 27 of the same rules. It is admitted that the tug and tow did not discharge their duty in this regard, but expressly violated the same.

That the barge had upon it, at the time of the collision, proper running lights, is not claimed by the respondent; but it insists that there was a white light upon the barge in collision, so placed as to have been visible to the navigators of the ferryboat. Upon this question the evidence that no such light was visible to, or in a position to be visible to, the navigators of the ferryboat, is overwhelming. That there may have been a white light upon one of the ends of the barge is possible, but the probabilities are against its existence at the time of the collision. It may have been placed upon the barge at the time it was lashed to the wharf, but, after the barges were broken loose by the Chatham and sent adrift in the harbor, it is extremely doubtful if it remained in its place or continued to burn. It was the duty of the barge under Inspectors' Rule 11, adopted January, 1902, by the Board of United States Supervising Inspectors of Steamboats, under authority of an act of Congress approved June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2875], to have the colored or running lights placed on the barges so as to be visible to approaching vessels during the navigation of such barge, and for accidents arising from such failure the barge will be liable. The Lyndhurst (D. C.) 92 Fed. 681; The Nettie L. Trice (D. C.) 110 Fed. 461; The Komuk (D. C.) 120 Fed. 841. As to the existence of the running lights on the tug, the evidence quite clearly establishes the fact that, while it had the proper running lights, the same were excluded from the view of the navigators of the ferryboat by the position of the tug between the two barges, upon each of which was a house considerably higher than these lights on the tug; and this may be said to be true whether this be treated as a crossing or overtaking case, since the screens behind the lights would obstruct their view from those on the ferryboat in any event. As to the tug's towing lights, the facts are somewhat different. While the tug likewise had her towing lights burning, the contention is that they were improper lights, and did not conform to article 3 of the Inland Rules of Navigation, which provides that a steam vessel, when towing another, shall, in addition to her side lights, "carry two bright white lights in a vertical line, one over the other, not less than three feet apart." 30 Stat. 97 [U. S. Comp. St. 1901, p. 2877]. The towing lights as carried on this tug were not in vertical line, one over the other, and could not have been by reason of their construction. Instead of being placed as required by statute, they were placed upon a prong, said by the master of the tug to be about a yard long, across the mast or flagstaff, from each end of which the lights

were attached or hung by means of a cord, and let down one lower than the other, a distance supposed to be three feet. This was the condition in which the lights were at the time of this collision, and, confessedly, lights so constructed were not in strict accordance with the rules of navigation, and could not be said to be in a vertical line, one over the other, having reference to the flagstaff to which they should be attached. Lights so constructed upon this prong or crossbeam placed horizontally from the flagstaff would be liable to be on a horizontal rather than a vertical line, unless the greatest care was exercised in placing them by means of the cords that drew them up to the ends of the prong; and, if such should be the case, naturally one light would obstruct the view of the other to a vessel on a crossing course, and particularly to a person observing the lights from a high range, as did the ferryboat's master. In no event would they be such as was contemplated by the statute, when it expressly provided that one should be placed vertically above the other and three feet apart. In the present case, while the stern of the tug protruded slightly out from the end of the barges, the towing lights over the tops of the barges were not observed by the navigators of the ferryboat until within 50 feet of the tug and tow, they seeing first one and then the other, when they were confounded by the ferryboat's navigator, who viewed them from a higher elevation than the tug's lights, with lights supposed to be at Clark's Wharf on the Norfolk side of the harbor. This very confusion may have been caused by the peculiar construction of this arrangement for the towing lights, and certain it is that the lights were not discovered, being, as they were, in part behind the barge, until the two vessels were virtually in collision; and, since their construction was not such as the statute requires, the ferryboat, under the circumstances of this case, should not be held liable for her failure to observe the same earlier. The failure to properly place the lights on a ship is a serious fault, and for which liability should follow when persons or property are injured thereby. The Conoho (D. C.) 24 Fed. 758; The Arthur (D. C.) 108 Fed. 557; The Komuk (D. C.) 120 Fed. 841.

The libelant charges as a contributing cause to the collision the negligence of the respondent in mooring the barges to the front of the Bay Line Wharf, near the Boston Piers, and the breaking therefrom of the same by the collision with the Chatham, another of respondent's steamships, in moving her from one place to another at its piers. In passing, it may be said the evidence tends to establish libelant's contention in this regard in both particulars, as it would seem that respondent should neither have made fast its barges so that they would break loose and go adrift without some one on them, nor handled its ship while at its piers so as to allow the same to be brought in collision with other shipping properly located; and certainly, under the circumstances of this case, there was nothing to indicate why there should have been any difficulty in either respect. Just how far this negligence should be taken into account in this case need not be determined, since, in the view of

the court, the collision itself was brought about by the negligence of the respondent as hereinbefore stated.

Respondent's contention that this is an overtaking case, instead of a crossing case, is not borne out by the evidence. Indeed, the conduct of its own officers at the time of the collision is inconsistent with this theory of the case. Those navigating the tug and tow did no act such as was required by the rules in giving an alarm or emergency signal, that would have been required of them had the ferryboat been overtaking them. Indeed, it is quite clear from their conduct that their view of the ferryboat was entirely obstructed by reason of the tug's location between the barges, which would not have been the case for a moment had the ferryboat been approaching them from behind, the lights of which would have reflected directly upon and been in full view of the navigators of the tug.

Nor is the contention of the respondent that the collision was the result of inevitable accident tenable upon the proof adduced. There is no element in the case tending to establish such a theory. On the contrary, the negligence of the respondent in all the particulars referred to would exclude the same. The tug and barges having violated the statutory rules of navigation, as well in respect to their lights as the navigation of the tug at the time of the collision, and such violations being within themselves sufficient to bring about the accident, the burden is upon the respondent to show that the violation not only did not probably produce, but could not have contributed to, the collision, and under such circumstances it will not do for the respondent to raise a doubt as to the management of the other vessel. All reasonable doubts as to the vessel in fault must be resolved in her favor, and she held not contributing to the collision unless her fault is clearly proved. The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186, 197, 15 Sup. Ct. 804, 39 L. Ed. 943; The Victory and Plymouthian, 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519.

It follows from what has been said that the injury in this case arose solely from the fault of the tug and tow, and a decree may be entered to that effect.