THE LIZZIE CRAWFORD.

THE ACTIVE.

(District Court, E. D. Pennsylvania. June 10, 1909.)

No. 50.

1. COLLISION (§ 95*)—STEAMER AND TUG WITH TOW—MUTUAL FAULT.

After dark a tug started to tow a car float about a mile and a half down the Delaware river at Philadelphia from one pier to another. The float was alongside the tug on the starboard side, and the cars thereon obstructed the side lights and perhaps the towing lights of the tug from that side, and the float carried but a single white lantern placed on the rail at the starboard corner of the bow. Owing to the wind and ebb tide they missed the pier and swung to the eastward to make a turn, and when heading east the tug stopped, allowing the vessels to drift downstream broadside on, and while in such position the float was struck by a steam-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ship coming upstream, which immediately proceeded without stopping or giving her name. *Held*, that the steamship was in fault because of her failure to stand by as required by Act Sept. 4, 1890, c. 875, § 1, 26 Stat. 425 (U. S. Comp. St. 1901, p. 2902), and prima facie responsible for the collision, and was also in fault for being on the wrong side of the river without giving any good reason therefor; that the tug was also in fault for placing herself and tow in a position where her lights were probably obscured from an approaching vessel by the cars on the float without sounding any warning of her presence to the approaching steamer, and for not mounting a green light on the starboard bow of the tow as required by the Pilot Rules for Inland Waters (Ed. 1905) rule 12, par. 3.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

2. COLLISION (§ 75*)—LIGHTS—BARGE IN TOW ALONGSIDE—PILOT RULES.

Pilot Rules for Inland Waters (Ed. 1905) rule 12, par. 3, applies to the Delaware river, and requires a car float in tow alongside of a tug on the starboard side, where the cars obscure the side lights of the tug, to carry a green light at night on her starboard bow.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 75.*]

In Admiralty. Suit for collision.

John F. Lewis, for libelant.

Henry R. Edmunds, for respondent.

J. B. McPHERSON, District Judge. On December 3, 1906, about half past 5 o'clock in the evening, the steam tug Lizzie Crawford, 75 feet long, of about 100 horse power, started from Pier 22, South Wharves, in the city of Philadelphia, to tow car float No. 72, belonging to the Baltimore & Ohio Railroad Company, down the Delaware river to Pier 62, a distance south perhaps of a mile and a half. The tug was fastened to the float by three lines in the customary manner, her starboard side being in contact with the port side of the float, and her position being so far aft that about 100 feet of the float projected in front of her bow. The float carried 10 loaded cars arranged in 2 parallel rows of 5 cars each, their tops reaching at least as high as 20 feet—perhaps 2 or 3 feet higher—above the level of the water. The evening was dark when the trip began, and soon grew darker, although the atmosphere was not thick and there was nothing to prevent the seeing of lights for more than a mile. The tug carried side lights and towing lights, and they were set and burning. No evidence was offered concerning the height of her foremast nor concerning the exact position of the towing lights, so that I cannot find with confidence whether these lights would be visible to a vessel approaching from the starboard side of the float; but it is clear that the side lights of the tug could not be seen by a vessel in that position. The only light on the float was a white light, an ordinary ship's lantern, which was placed on the rail at the starboard corner of the bow. The tide was ebb, and there was a moderate breeze from the northwest when the tug got under way. About the time Pier 62 was reached, however, the wind increased suddenly and blew hard from the northwest; and the force of the wind and tide made the float temporarily unmanageable (although under ordinary circumstances the tug was fully able to control it), and carried the tow beyond the pier for which

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

she was bound. Up to this time the course had been close to the western or Pennsylvania shore; but it now became necessary to turn the float toward the eastern or New Jersey shore, and move out somewhat further into the channel across the tide, in order to turn the head of the float northerly and then westerly so as to reach the pier upon the second attempt. To execute this maneuver the tug backed, swung the float around so that her broadside faced south (the tug lying, therefore, on her northerly side), and then stopped her engine for several minutes. The reason for stopping the engine at that time does not appear, but the result was that the headway of the float was stopped or nearly stopped, and that she drifted downstream, broadside to, under the influence of the wind and the ebb tide. She was then about 200 feet from the western edge of the channel.

While she was in this position, the starboard bow of the Active, a Norwegian steamship 290 feet long, of about 600 tons register, drawing not more than 13 feet of water, carrying a cargo of cocoanuts from St. Andrew's Island to Philadelphia, struck the float a glancing blow well aft on the starboard quarter, doing the damage complained of. The steamship immediately proceeded on her way as soon as she found that her stern was clear, without stopping to make inquiry concerning the extent of the injury done by the collision, and without giving her name or any other information to the tug or float. This failure to comply with Act Sept. 4, 1890, c. 875, 26 Stat. 425 (U. S. Comp. St. 1901, p. 2902), raises a presumption of the Active's negligence; she made no effort to show any reasonable cause for her failure to stop, and is therefore prima facie to blame. The act is as follows:

"That in every case of collision between two vessels, it shall be the duty of the master or person in charge of each vessel, if and so far as he can do so without serious danger to his own vessel, crew and passengers (if any), to stay by the other vessel until he has ascertained that she has no need of further assistance, and to render to the other vessel, her master, crew and passengers (if any) such assistance as may be practicable and as may be necessary in order to save them from any danger caused by the collision, and also to give to the master or persons in charge of the other vessel the name of his own vessel, and her port of registry, or the port or place to which she belongs, and also the name of the ports and places from which and to which she is bound. If he fails to do so, and no reasonable cause for such failure is shown, the collision shall, in the absence of proof to the contrary, be deemed to have been caused by his wrongful act, neglect or default."

I had occasion to consider this statute recently in The Williamsport (D. C.) 167 Fed. 190, and some of the authorities are referred to in the opinion delivered in that case.

But the Active was at fault in at least one other respect; she was on the wrong side of the river, and has not justified her conduct in taking that course. There was plenty of room on the eastern or right-hand side of the channel—its width at the point of collision is more than a quarter of a mile; there were no other obstructing vessels in the neighborhood; and the only reason given by the pilot for coming up on the westward side was a reason of his own convenience. Upon that course he could steer by the electric lights along the shore, and it was apparently on this account alone that he deliberately violated the

well-known rule that requires vessels to keep to the right in a narrow channel. Other faults are charged against the Active, but I see no need to consider any other, since the two already referred to are sufficient to establish her negligence.

Was the Lizzie Crawford also to blame? It has been argued that she had no towing lights up at all, and the negative testimony to this effect on the part of the Active tends to support the argument. I have found the fact to be otherwise, however, but the testimony certainly leaves it doubtful whether these lights could be seen from a vessel coming toward the tug from beyond the starboard side of the float. If these lights were placed higher than the tops of the cars, it would have been easy to prove that fact, and I think it fair to assume, therefore, that, in the broadside position occupied by the tow shortly before the collision, the cars would probably shut out the view of the towing lights upon the tug. If this is correct, the tug was negligent in not adopting some other means of making her presence known. She could have used her whistle, and it seems to me that it would have been no more than ordinary precaution to have whistled while the float was broadside to the stream, with the engine stopped and the tow drifting with the wind and tide. But, aside from this, the tug was at fault in failing to see the steamship in time, and in failing to signal when she learned that the ship was approaching. There were two men on the lookout upon the float, but their testimony is not very definite about what they saw and what notice they gave to the tug. One of them did not see the steamship until she was only "about a square" away, although he testifies that both her lights were burning. It is the fact that all her lights were set and plainly visible for more than a mile. The other testified that he saw her about 900 feet away, but he adds that she was "pretty close when I discovered her." Thereupon he testified:

"I hallooed to the captain, but it was blowing so heavy I don't think he heard me right the first time, and I started—I got about, I suppose, 15 or 20 feet from where I was standing—'There is a steamer coming,' I said. 'She is going to the westward of us;' that is what I said. I seen her sheer to the westward."

How long this was before the collision does not satisfactorily appear. The captain merely testified that he got the lookout's report "before the collision," but he does not say how much time intervened. If he was notified of the steamship's approach, even if the notice came only a few minutes before the collision, he certainly ought to have used the whistle at once in order to give such warning of his presence as was possible, and failure to do so was a fault.

But there is another fault that is chargeable to the tug, namely, the failure to have the proper light on the float, as required by the third paragraph of rule XI of the Pilot Rules for Inland Waters, entitled "Lights for Barges and Canal Boats in Tow of Steam Vessels" (see page 6 of Pilot Rules, Official Edition of 1905). This rule was in force at the time of the collision, and, as there is some difference of opinion between counsel concerning the scope of certain paragraphs, it may be well to quote the paragraphs over which the dispute arises:

"Rule XI. (1) On the inland rivers, bays, sounds, and harbors of the United States—except on the waters of the Hudson River and its tributaries from Troy to Sandy Hook, the waters of the East River and Long Island Sound, and the waters entering thereon, and to the Atlantic Ocean, to and including Narragansett Bay, R. I., and tributaries and Lake Champlain—barges and canal boats towing astern of steam vessels, when towing singly, or what is known as tandem towing, shall each carry a green light on the starboard side and a red light on the port side.

"(2) When two or more boats are abreast, the colored lights shall be carried at the outer side of the bows of the outside boats.

"(3) Barges or canal boats towing alongside a steam vessel shall, if the deck houses, or cargo of the barge or canal boat be so high above water as to obscure the side lights of the towing steamer, when being towed on the starboard side of the steamer, carry a green light upon the starboard side; and when towed on the port side of the steamer, a red light on the port side of the barge or canal boat; and if there is more than one barge or canal boat abreast, the colored lights shall be displayed from the outer side of the barges or canal boats.

"(4) Barges and canal boats, when being towed by steam vessels on the waters of the Hudson river and its tributaries from Troy to Sandy Hook, the East river, and the Long Island Sound (and the waters entering thereon and to the Atlantic Ocean), to and including Narragansett Bay, R. I., and tributaries, and Lake Champlain, shall carry lights as follows:

"(5) Barges and canal boats being towed astern of steam vessels, when towing singly or what is known as tandem towing, shall each carry a white light on the bow and a white light on the stern.

"(6) Barges and canal boats when towed at a hawser two or more abreast, when in one tier, shall carry a white light on the bow and a white light on the stern of each of the outside boats: when in more than one tier, each of the outside boats shall carry a white light on its bow; and the outside boats in the last tier shall carry, in addition, a white light on the outer after part of stern.

"(7) Barges or canal boats towed alongside a steam vessel, if on the starboard side of said steam vessel, shall display a white light on her own starboard bow; and if on the port side of said steam vessel, shall display a white light on her port bow; and if there is more than one barge or canal boat alongside, the white lights shall be displayed from the outboard side of the outside barge or canal boat: Provided, that car floats of 200 feet or over in length shall have a white light at each outboard corner of said floats."

It will be seen that paragraphs 1, 2, and 3 (the numbering is my own for purposes of convenient reference) apply, inter alios, to the Delaware river, and each paragraph has to do with a single subject—paragraph 1 dealing with barges towed astern; paragraph 2, with barges towed abreast; and paragraph 3, with barges towed alongside, but only under certain conditions. It is the latter paragraph that is applicable in the present case, because the conditions existed. The rule then turns to the waters that were excepted in paragraph 1—the Hudson river with certain of its tributaries, etc.—and, having specified them again in paragraph 4, goes on to make different regulations for lights upon these waters. Paragraph 5 deals with barges towed astern, and corresponds with paragraph 1; barges towed abreast are dealt with in paragraph 6, corresponding with paragraph 2; and, finally, barges towed alongside under all conditions are dealt with in paragraph 7, corresponding with paragraph 3. That paragraphs 5 and 6 apply only to the waters specified in paragraph 4 is, I think, so plain that there is little room for argument. The scope of paragraph 7 is more doubtful. It certainly applies to all barges towed alongside on the waters specified in paragraph 4, but the question now is, Does it

apply also to such barges upon other inland waters? If it applies in all cases to barges towed alongside upon such waters, it conflicts irreconcilably with paragraph 3, so far as barges are concerned whose deck, deckhouses, or cargo obscure the lights of the tug, and therefore I think that, if it applies at all (as it may) to barges upon the Delaware river, it can only apply when the lights of the tug are not obscured by the deck, deckhouses, or cargo of the barge. When these lights are thus obscured (as they were in the present case), paragraph 3 applies on the Delaware river, and not paragraph 7. The proviso to paragraph 7 could not possibly be controlling in the dispute under consideration, for two reasons: First, the float was less than 200 feet in length; and, second, it only carried a white light at one outboard corner.

My conclusion on this branch of the case is that, as the cargo of the float obscured the side lights of the tug when being towed on its starboard side, there should have been a green light in place of the white light on the starboard side of the float. Failure to display such a light violated paragraph 3 of rule XI, and was a fault on the part of the tug.

A decree may be entered, finding both vessels at fault and dividing the damages.