## THE TRANSFER NO. 15.

### THE LANSING.

(Circuit Court of Appeals, Second Circuit. May 8, 1917.)

Nos. 241, 242.

1. COLLISION $\iff$95(2)—STEAMSHIP AND MEETING TOW—INSUFFICIENT LOOK-
OUT.

A collision in the daytime on East River between a steamship, which was passing up on the deep water range, and one of two car floats along-side a meeting tug, *held*, on conflicting evidence, due solely to the fault of the tug in misunderstanding the steamer's passing signal of two whistles, which was justified by the positions of the vessels, probably because of not having a lookout in the bow, and so crossing the signal and turning to starboard across the course of the steamship, which at once stopped and reversed, but too late to avoid collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202.]

2. COLLISION $\iff$99—PRECAUTIONS IN HARBOR—LOOKOUT.

It is incumbent on a vessel navigating New York Harbor and vicinity, even in the daytime, to maintain a vigilant lookout.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 211, 212.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by the Lansing Steamship Company, Incorporated, owner of the steamship Lansing, against the steam tug Transfer No. 15 and car float N. Y., N. H. & H. R. R. No. 41, the New York, New Haven & Hartford Railroad Company, claimant, with cross-libel against the Lansing, in which the Seaconnet Coal Company intervened. Decree against the Lansing, and the other parties appeal. Reversed.

Appeal in admiralty from decree dismissing the libel of the steamship Lansing against the steam tug Transfer No. 15, and sustaining

the libel of the steam tug against the steamship. The cargo of the Lansing belonged to the Seaconnet Coal Company, which intervened pro interesse suo in the action against the Transfer No. 15. The intervener also appealed.

James T. Kilbreth and Irving Miller, both of New York City, for the Transfer No. 15.

Robinson Leech, of New York City, for the Lansing.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass. (Edward E. Blodgett, of Boston, Mass., of counsel), for intervener.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge. [1] The collision out of which these litigations arose occurred off the ferries at the foot of Whitehall street, Manhattan, on a fair afternoon (April 19, 1916), when the wind was light, the weather clear, and the East River tide still running ebb, although the tide had begun to rise. The Lansing is a steamer 250 feet long, originally built for traffic on the Great Lakes, and of very slow speed. The Transfer No. 15 is an able tug 125 feet long, and had in tow a loaded carfloat on each side, each float being 327 feet long. The Lansing was bound up the East River; the Transfer, with her floats, was coming down, intending to round the Battery and proceed to the New Jersey shore. There was no unusual amount of traffic in the neighborhood, and the evidence contains no suggestion that any vessel not proceeded against interfered with navigation. The collision was a violent one between the bow of the Lansing and the port side of the Transfer's port carfloat, about 50 feet abaft her forward end. That such a collision could happen in broad daylight is of itself almost evidence of negligence. The Tugboat No. 6, 170 Fed. 306, 95 C. C. A. 502.

On consideration of the pleadings and the testimony of those in charge of the navigation of the colliding vessels, we find it impossible to harmonize their statements or to arrive at any story of collision not somewhere denied in vital details. There are some points, however, so conclusively proven as to dominate, and from these controlling facts we deduce a result favorable to the Lansing. That steamer entered the channel between the Battery and Governor's Island upon the "deep water range." Such is the testimony of her master, while the captain of the Transfer admitted that when he first noticed the steamship (he being above Pier 7, East River) she was on that range. The Transfer and her tow, by the statement of her own master, "came down the East River to go under the Brooklyn Bridge, and proceeded down about in the middle of the river, favoring the New York shore." The tug master's intention was "to follow the middle of the river as near as possible, and as we proceed down we keep drawing in to the New York shore." The Lansing against the tide was making not over 3 miles an hour by the land, while the Transfer on her own testimony was similarly going at the rate of at least 9 miles an hour. The place of collision was off the ferries nearest to Pier 4 East River, and about 1,000 feet off the pier ends. This is the evidence of the master of a

tug which was lying off the ferries, who had a full view of the collision, and was introduced as a witness on behalf of the Transfer. The distance from the pier end given by him puts the place of collision on the "deep water range." The heading of the Transfer and her floats at the moment of impact is plainly testified to by her master, who, when asked how his boat was heading at the time they came together, replied:

"I should think that my boat was heading directly toward * * * the Staten Island ferry rack."

With the place of collision thus fixed, and the bearing of tug and tow also fixed within narrow limits, we next inquire as to the angle of collision. On this point there is practical unanimity among the witnesses—it was a right-angled blow—a statement amply confirmed in our opinion by the nature of the wounds. But if the blow was right-angled, the point of contact substantially on the deep water range, and the tug and carfloats heading for the ferry racks nearest Pier 4, the conclusion is mathematical that the Lansing at collision was on the range, and had never substantially altered her course from the moment she was first seen by the Transfer. Such is her evidence, which in our judgment is confirmed by the foregoing.

The hopeless conflict of evidence herein relates to the signals given and the relative bearings of the two vessels at the time of giving them. There is a fair preponderance of evidence that the Lansing blew first, giving a signal of two whistles. That the first signal was given by the Lansing is admitted in the Transfer's pleadings, but it is said to have been a signal of one blast. It is proved as a two-whistle signal, and we perceive no reason why it should not have been heard and understood by the Transfer, which undoubtedly replied with one whistle.

The vital point is whether, when the Lansing blew two whistles, she had the Transfer on her port or starboard bow. The testimony on this is utterly irreconcilable; but when it is observed that the vessels when not over half a mile apart were approaching each other at the rate of at least 1,100 feet a minute, that the collision occurred on the deep water range, with the port side of the Transfer's floats in the act of crossing the Lansing's bow, and the floats and tug heading for the upper ferry slips, we think it demonstrated that in order to produce collision the tug and tow must have come (under a port helm) from the Lansing's starboard side.

It is not thought that the Transfer was as far over to Brooklyn (or starboard), when the Lansing blew two whistles, as the captain of the steamer asserts; but she was enough to starboard of the Lansing's course to render a two-whistle signal (under the meeting rule) proper. This is in accord with the Lansing's evidence, and is very nearly admitted by the master of the Transfer when he assented to counsel's proposition that, if he had understood the Lansing's first signal as of two whistles, he could "have answered with two and safely gone down on her starboard side."

Thus we find that this disaster occurred through a misunderstanding of whistles, for which no excuse is proffered; as a result thereof

the Transfer ported and hard-aported, and so threw herself directly across the path of the Lansing, which immediately upon hearing the Transfer's single whistle stopped, reversed, and gave the alarm. The steamer was struck substantially on the deep water range; she did not change her course, and indeed scarcely had time so to do.

The reason for this misunderstanding of signals is largely found in the insufficiency of the Transfer's lookout. The master of that tug had a deckhand on top of the cars on the starboard float. His duties seem to have been for the most part to announce "small craft, gasoline boats, and rowboats." He must have seen the Lansing; should have heard her whistles and understood them and reported them. But (according to his captain) the only attention he paid to the steamer was, after the Transfer had put her wheel hard aport, to ejaculate, "I wonder where that fellow thinks he is going."

[2] We have recently insisted upon the necessity of a lookout, and a good one, even in the daytime. Delaware, etc., Co. v. Central R. R. Co., 238 Fed. 560, —— C. C. A. ——). The rule is equally to be insisted upon here, for it can hardly be doubted that a vigilant lookout would have announced the Lansing's signal which the master (who was solely in charge of a flotilla of the weight and capacity of a large ocean steamer) might easily misinterpret, as he unquestionably did.

Finding that the situation of these vessels when they were between a quarter and a half a mile apart was such that the Lansing had the Transfer on her starboard bow on a course which made a passing starboard to starboard proper within the meeting rule, it is ordered that the decrees below be reversed, with one bill of costs to the appellants in this court, and the cause remanded, with directions to dismiss the libel against the Lansing and sustain that against the Transfer No. 15.