### THE TRANSFER NO. 8.

### MESICK & MESICK TRANSP. CO. v. NEW YORK, N. H. & H. R. CO.

### JAMES McWILLIAMS BLUE LINE, Inc., v. SAME.

(District Court, E. D. New York. April 22, 1926.)

Nos. 6690, 7061.

**1. Collision** ⊜⇒98—Tug held in fault for collision between tows, for failure to keep lookout or see lights of other tow.

A collision on East River in early morning between car floats alongside a transfer tug, passing down on the Brooklyn side, and barges in tow of another tug crossing diagonally over from the Brooklyn side *held* caused solely by faults of the transfer tug in failing to keep a proper lookout, and hear and answer the signal of the other tug or to see the lights of her tow,

or to stop and reverse at the other's alarm signal.

**2. Collision** ⊜⇒98.

A tug is responsible for failure of her tow to carry proper lights.

**3. Collision** ⊜⇒11.

Pilot rules, adopted by the supervising inspectors, are valid and binding.

**4. Collision** ⊜⇒98—Failure to comply with rule as to position of lights on tow held not to render tug liable for collision.

Failure to carry lights in her tow in the position required by the pilot rules *held* not to render a tug liable for a collision by another vessel running into her tow, where the barges in her tow all carried lights as visible as they would have been in the prescribed position.

In Admiralty. Suits by the James McWilliams Blue Line, Inc., owner of the barge Blue Star, and by the Mesick & Mesick Transportation Company against the Steam Tug Transfer No. 8, the New York, New Haven & Hartford Railroad Company, claimant, and the steam tug Owen J. McWilliams and the barges Belle F. Mesick, A. N. Abbie, and Thomas Reddy, impleaded. Decree in each case for libelant against the Transfer No. 8 and in favor of impleaded respondent.

Leo J. Curren, of New York City, for James McWilliams Blue Line, Inc., the McWilliams, and the Abbie.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for the Transfer No. 8.

Macklin, Brown & Van Wyck, of New York City (Horace L. Cheyney, of New York City, of counsel), for Mesick & Mesick, Transp. Co., the Mesick and the Reddy.

CAMPBELL, District Judge. In the first above entitled suit, on the petition of New York, New Haven & Hartford Railroad Company, the steam tug Owen J. McWilliams and the barges Belle F. Mesick, A. N. Abbie, and Thomas Reddy were impleaded under the Fifty-Sixth rule in admiralty. In the second above entitled suit, on the petition of New York, New Haven & Hartford Railroad Company, the steam tug Owen J. McWilliams and the barges A. N. Abbie and Thomas Reddy were impleaded under the Fifty-Sixth rule in admiralty.

On stipulation both suits were tried together, and, as they arise out of the same transaction, one opinion will be sufficient. On conflicting testimony I find as follows:

[1] At about 4:05 or 4:10 o'clock on the morning of March 17, 1924, the steam tug Owen J. McWilliams left the French pier,

which is the pier next below the canal terminal, at the entrance to Newtown creek with four loaded coal barges in tow, bound east, and intending to pass up the East River on the New York side of Blackwell's Island and through Hell Gate. The tow was a hawser tow, arranged in two tiers, with three barges in the hawser tier, the Belle F. Mesick being the starboard, the Blue Star the middle, and the A. N. Abbie the port barge, and one barge in the second tier, the Thomas Reddy, towing under the port boat of the hawser tier.

The Belle F. Mesick was about 112 feet in length, the Blue Star from 136 to 140 feet, the A. N. Abbie about 116 feet, and the Thomas Reddy about 110 feet in length. The hawsers were from 75 to 100 feet long, and the distance from the stern of the tug to the stern of the last barge was from 300 to 350 feet. The McWilliams had lighted at all times, from the time she left the French pier until she returned, her running lights, her range light on the forward mast, with two towing lights under it, and a range light on the staff aft. There were also lights which shone on the deck.

On each of the barges there was a bright white light on a pole about 15 feet above the cabin. The weather was clear, northwest wind, velocity 41 miles per hour, and tide strong flood. On leaving the pier the McWilliams headed into the strength of the tide.

The master of the McWilliams was in command and at the wheel, but as soon as he got her out of the eddy he turned her over to the mate, a competent licensed man, who died before the trial of this suit. The No. 8 was not visible to those on the McWilliams at that time.

The master remained in the pilot house and sat down on a chair by the wheel, as it was his custom when going east not to retire until they passed through Hell Gate. The McWilliams continued angling over toward the New York shore against the tide, as it was necessary to be careful in turning or the tow would set on Matamora Rock.

As the McWilliams was angling down against the tide before making her turn, her tow by the force of the tide was further up the river, and it may be that the running lights on the McWilliams were not visible to those on the No. 8 when above Newtown creek, coming down along the Brooklyn shore and about one-quarter of a mile distant; but the No. 8 sounded no signal, although her master said the McWilliams was ahead of the No. 8, heading down the river, that the No. 8 was overtaking her, and he

14 F.(2d)—29

thought she was light. But it seems to me that it is more probable that this was the situation in which the No. 8 found herself after she had commenced to angle over to the New York shore, and that she had not looked at the McWilliams with any care before that time.

New York, New Haven & Hartford Transfer No. 8 had come from 112th street, Harlem, bound for Thirty-Ninth street, East River, down between Blackwell's Island and the Brooklyn shore, with two car floats in tow, one on each side. The No. 8 was 102 feet long; the float on her port side about 270 feet; the float on her starboard side about 280 feet. The floats extended about 150 feet in front of the No. 8. The floats were closer in the bow than in the stern, and made fast with cross-lines. The port float extended about 45 feet ahead of the starboard float.

The master of the No. 8 testified before the local inspectors that, after passing Blackwell's Island, the No. 8 with her tow came down about 400 feet off the Brooklyn shore, but when between the ferry and Pidgeon street, just above Newtown creek, she angled over toward the New York shore, and when opposite the creek was well out in the river, favoring the Brooklyn shore. The master of the No. 8 knew that tows going east came out of Newtown creek on the flood tide.

The McWilliams continued angling out in the river, and saw the green light and range light aft, but not the red light, of the No. 8, when the No. 8 was about off the sugar house at Long Island City, and gave her the two-whistle signal. The No. 8 did not answer this signal, but continued to come on down angling toward the New York shore.

A short time after giving the two-whistle signal it became apparent that a collision would occur, and the McWilliams sounded an alarm, and again sounded an alarm, and the No. 8 sounded an alarm, and shortly after that stopped and reversed her engines, when her master and deckhand say they saw a dark object ahead. The McWilliams tow was then about the center of the river, and the starboard float in tow of the No. 8 struck the Mesick, and the port float in tow of the No. 8 struck the Blue Star, inflicting damage to the two floats.

There was ample room for the No. 8 to have gone clear between the McWilliams tow and the Brooklyn shore, as the McWilliams tow was from 1,000 to 1,200 feet off the Brooklyn shore at the time, and there were no vessels navigating between the McWil-

liams tow and the Brooklyn shore, which would have interfered with that maneuver.

Before the collision occurred, the McWilliams tug continued to round to starboard to pass up the river, showed her green light and towing lights to those on the No. 8, and after the collision passed up with her tow on the starboard side of the No. 8, and under the stern of the No. 8, landing her tow in Newtown creek.

The McWilliams and the No. 8 displayed the proper lights. The carfloats in tow of the No. 8 displayed lights at the places required by the rules. The four barges in tow of the McWilliams each displayed one white light on a staff 15 feet above the cabin at the stern, but the outside barges did not display the other lights required by the rules.

There was evidence that lights of the character of those displayed on the barges could be seen for five miles, and the lights on the car floats in tow of the No. 8 and on the barges in tow of the McWilliams were lanterns which could probably be seen for the same distance. The failure to maintain a proper lookout is a fault. The Nevada, 106 U. S. 154, 1 S. Ct. 234, 27 L. Ed. 149; The Transfer No. 15, 243 F. 174, 156 C. C. A. 40; D., L. & W. R. Co. v. Central R. of New Jersey, 238 F. 560, 562, 151 C. C. A. 496; The Tugboat No. 6, 170 F. 306, 95 C. C. A. 502.

There was no lookout on the bow of or on the cars on either car float in tow of the No. 8, and if the master and deckhand of the No. 8, who also was the lookout, and who were in the pilot house, could not see any lights on the barges in tow of the McWilliams, as they testified, then it must have been because they could not see with the tow made up as it was, with loaded cars on each float, and in that event it was not possible for those in the pilot house of the No. 8 to maintain the lookout that was required. The Buenos Aires (C. C. A.) 5 F.(2d) 425, 431. A proper lookout was not maintained on the No. 8, or the lights on the barges in tow of the McWilliams, which were good, bright lights, would have been seen by the lookout on the No. 8 and the collision prevented. D., L. & W. R. Co. v. Central R. of New Jersey, supra.

The two-whistle signal given by the McWilliams tug was a proper signal, if it be considered that the situation was a passing one, as the McWilliams did desire to pass to starboard of the No. 8 and swing her tow, so as to pass up between Blackwell's Island and the New York shore, and she had crossed the bow of the No. 8 before giving the signal, and the green light only and not the red light of the No. 8 was visible to those on the McWilliams at that time.

This signal was also a proper signal, if the witnesses for the No. 8 testified truly, because they said that the McWilliams appeared to be ahead of them, and that the No. 8 was pursuing substantially the same course as the McWilliams tug and overtaking her, and if the No. 8, as the overtaking vessel, desired to pass the McWilliams tug, then the No. 8 should, by proper signal, under article 18, rule VIII, Pilot Rules, have reached an agreement with the McWilliams tug. If the No. 8 was an overtaking vessel, the McWilliams was under no obligation to inaugurate signals; but the McWilliams, by the two-whistle signal, indicated her desire that the No. 8 pass on her port side, which would have been the side toward the Brooklyn shore, and as an overtaking vessel it was the duty of the No. 8 to keep out of the way.

The passing signal of two whistles, blown by the McWilliams, was not answered by the No. 8, nor did the No. 8 navigate in pursuance of that signal, and this constituted a fault on her part. The No. 8 was also at fault for failure to stop and reverse when the first alarm was sounded by the McWilliams, and in waiting to stop and reverse until just before the collision.

The advocate for the No. 8 contends that the No. 8 saw the McWilliams tug long before the McWilliams tug saw her, and this may be true; but it clearly appears that the No. 8 did not sound an alarm until after the two-whistle signal and two alarms were sounded by the McWilliams. If the contention of the advocate for the No. 8 be accepted, and it be held that the master of the No. 8 saw the McWilliams before the No. 8 started to angle over toward the New York shore, then it would seem to me that the No. 8, after her master had seen the McWilliams, must have headed toward the McWilliams tow, which he should have seen, and which he would have cleared, if he had continued down reasonably close to the Brooklyn shore.

This is supported by the testimony of the master of the No. 8, who says he did not see the tow of the McWilliams until he was where it appeared as a shadow, and that, if the tow had not been there, he would have passed the McWilliams, which had turned and shown her green light, starboard to starboard. There was but little choice presented to the McWilliams, as she was in a position where she was compelled to go on and make her turn properly, or the tide would set her tow on Matamora Rock.

The No. 8, on the contrary, before she began to angle over to New York, and at the time when the two-whistle signal was sounded by the McWilliams, was in a position where she could have continued down along the Brooklyn shore, and have cleared the McWilliams and her tow; but, when she commenced to angle to New York, she headed for the tow of the McWilliams, and the failure of the No. 8 to sound any signal until just before she was right on top of the tow was a fault.

The No. 8 was not visible to the McWilliams when her master turned her over to the mate, and if the No. 8, as testified by her master, continued down about 400 feet off the Brooklyn shore, until between the ferry and Pidgeon street, there would have been no occasion for the McWilliams to watch the No. 8, as she would have safely passed between the McWilliams tow and Brooklyn, and it was because the No. 8 then started to angle toward the New York shore that the danger arose. The McWilliams saw the danger shortly thereafter, as she sounded her two-whistle signal when the No. 8 was off the sugar house just below Pidgeon street, and when her signal was not answered, and danger from the No. 8 was apparent, she sounded the alarm twice, and in starting out and continuing with her tow the McWilliams was without fault.

[2] While the No. 8 has been found at fault, there is still left for consideration her claim that the three outside barges did not carry the proper lights. The lights of the McWilliams complied with the rules; but notwithstanding that fact, if the lights of the barges did not comply, the responsibility for such failure would rest, not only on the barges, but on the McWilliams. The Sif (C. C. A.) 266 F. 166; The Eugene F. Moran (D. C.) 143 F. 187; Id., 154 F. 41, 83 C. C. A. 153; Id., 212 U. S. 466, 29 S. Ct. 339, 53 L. Ed. 600; The Nettie L. Tice (D. C.) 110 F. 461; The New York Central No. 22 (D. C.) 124 F. 750, affirmed 135 F. 1021, 68 C. C. A. 661; Foster v. Merchants' & Miners' Transportation Co. (D. C.) 134 F. 964; The Lizzie Crawford (D. C.) 170 F. 837; The Komuk (D. C.) 120 F. 841.

[3] The rules relating to the lights to be carried by the barges are found on page 25 of the Pilot Rules, and, so far as they are material, read as follows:

"Barges and canal boats, when towed at a hawser two or more abreast, when in one tier, shall carry a white light on the bow and a white light on the stern of each of the outside boats; when in more than one tier, each of the outside boats shall carry a white light on its bow; and the outside boats in the last tier shall each carry, in addition, a white light on the outer afterpart of the stern.
* * *

"When barges or canal boats are massed in tiers and towed at a hawser, as is usual on the Hudson river, there shall be carried on the forward port side of the port boat of each tier a white light, and on the forward starboard side of the starboard boat in each tier a white light, and on the after port side of the port boat in the stern tier a white light, and on the after starboard side of the starboard boat in the stern tier a white light.

"The white bow lights for barges and canal boats referred to in the preceding rules shall be carried at least 10 feet and not more than 30 feet abaft the stem or extreme forward end of the vessel. On barges and canal boats required to carry a white bow light, the white light on bow and the white light on stern shall each be so placed above the hull or deck house as to show an unbroken light all around the horizon, and of such a character as to be visible on a dark night with a clear atmosphere at a distance of at least 5 miles."

The advocate for the Belle F. Mesick contends that the Pilot Rules above quoted, relating to lights required to be carried on canal boats and barges, are invalid. He presented an extended argument against the right of Congress to delegate to the supervising inspectors the power to make the Pilot Rules which are in evidence.

These rules have for many years been applied by the Supreme Court, Circuit Courts, and District Courts, and it is unnecessary to cite a large number of cases in support of this statement. I shall content myself with one, Belden v. Chase, 150 U. S. 674, 14 S. Ct. 264, 37 L. Ed. 1218, which seems to me to be a sufficient authority for sustaining the validity of the rules by this, a court of first instance. In that case Mr. Chief Justice Fuller, at page 698, 14 S. Ct. 271, writing for the court, said, with reference to the Pilot Rules adopted by the supervising inspectors: "The rules laid down by the latter as thus authorized have the force of statutory enactment." And again, at the same page: "They are not mere prudential regulations, but binding enactments, obligatory from the time that the necessity for precaution begins, and continuing so long as the means and opportunity to avoid the danger remains."

[4] These rules were not complied with, but each barge did have a bright white light suspended on a staff on top of the cabin amid-

ships at the stern, and these lights were visible, if not for five miles, as there was some evidence introduced to show that similar lights had been, certainly for a number of times the distance the No. 8 was distant from said barges when the McWilliams gave the two-whistle signal, and should have been visible to the master and lookout of the No. 8 at that time, because the barges Mesick and Blue Star were struck right in the vicinity of their lights. The white lights carried by the barges apparently were as visible and for as long a distance as those on the corners of the car floats in tow alongside the No. 8, which I held complied with the rules, as in both cases lanterns were used. I find no disobedience of the rules with reference to the brilliancy of the lights carried on the barges in tow of the No. 8, nor the distance they could be seen, but the violation of the rules, as I see it, consisted in failing to place lights at the points provided by the rules.

We thus have a violation of the rules, but it is impossible for me to believe that the lights on the barges could not have been seen at all times by those on the No. 8, from before the time when the two-whistle signal was given by the McWilliams, if a proper lookout had been maintained, especially because it appears that one of the floats in tow of the No. 8 must have struck right at that part of the McWilliams tow where the lights of the four barges were visible. The positive testimony as to the lights on the McWilliams and the barges in her tow outweighs the negative testimony of the master and lookout of the No. 8.

The advocate for the No. 8 cites as passing on the identical rule, and as authority that the violation of that rule constituted a fault on the part of the McWilliams and the outside boats of her tow, The Sif, supra; but it seems to me that the case at bar is clearly distinguishable from that case, because in the case at bar it can be said that proper lights, in proper places, on the outside barges of the McWilliams tow, could not have sooner advised the No. 8 of the real situation. The existence of the lights on the staffs at the stern of the cabins of each of the barges in tow of the McWilliams was shown by positive evidence, and the floatman on the No. 8 even admitted seeing the lights on two of the barges.

The master of the No. 8 testified that lights of the character of those shown to have been displayed on the barges could be seen for one-half to three-quarters of a mile, and there was no testimony given that the No. 8 was even one-half a mile distant when she saw the bright lights described by her, and therefore the lights on the barges must have been visible to the master and lookout of the No. 8 if they were looking. The floats in tow of the No. 8 did not strike the bow of the Mesick, the starboard barge of the hawser tier, nor the aftermost boat of the tow, the Thomas Reddy, towing under the port boat of the hawser tier, and therefore the No. 8 was not deceived by the lack of lights; but the floats which she had in tow struck the starboard side at the stern of the Mesick, and the starboard side of the Blue Star at the stern, right where their lights were displayed, although under the rules the Blue Star was not required to carry lights.

The fact is that the floats in tow of the No. 8 crashed right in where the lights of the tow were displayed, and if the testimony of the master and deckhand lookout of the No. 8 that they saw no lights be true, then it is clear that lights at the bows and sterns of the outside barges, at the places provided by the rules, would not have given them any warning. This is further supported by the statement of the master of the No. 8, who said that he was familiar with the lights carried on the staffs at the stern of the cabins of the barges of the McWilliams tow, and had never seen, and did not look for or expect to see, tows lighted in any other manner.

This statement of the master of the No. 8, even if it showed that barges generally did not comply with the rules, would not be an answer to a violation of the rules; but it is important as showing that the presence of the lights at the points required by the rules would not have sooner advised the No. 8 of the real situation, if her master was unable to see the lights placed at the very place where he testified he expected to find them.

The failure to obey a pilot rule is not more than a failure to obey a statute, and the courts have held that a vessel that ignores the statute is not at fault, unless the position is a cause not a condition of the collision. The Clara, 55 F. 1021, 5 C. C. A. 390; The No. 1, 180 F. 969, 104 C. C. A. 125; The Morristown (C. C. A.) 278 F. 714. I therefore find that the failure to place lights on the barges in tow of the McWilliams was a condition and not a cause of the collision, and that the No. 8 was solely to blame.

A decree may be entered in the first above entitled suit in favor of the libelant and against the No. 8, with costs and the usual order of reference, and in favor of the steam tug Owen J. McWilliams and the

barges Belle F. Mesick, A. N. Abbie, and Thomas Reddy, dismissing the petition and libel, with costs against the New York, New Haven & Hartford Railroad Company, the petitioner.

A decree may be entered in the second above entitled suit in favor of the libelant and against the No. 8, with costs and the usual order of reference, and in favor of the steam tug Owen J. McWilliams, and the barges A. N. Abbie and Thomas Reddy, dismissing the petition and libel, with costs against the New York, New Haven & Hartford Railroad Company, the petitioner.

Settle decree on notice.