**NEW YORK, NEW HAVEN & HART-FORD RAILROAD COMPANY,**
Libellant,

v.

**The BALTIMORE AND OHIO RAIL-ROAD COMPANY, Respondent.**

No. 19567.

United States District Court
E. D. New York.

May 3, 1955.

Edward R. Brumley, New York City, for libellant, R. M. Peet, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for respondent, Donald M. Waesche, Jr., New York City, of counsel.

GALSTON, District Judge.

Libellant seeks to recover damages to one of its carfloats incurred as a result of a collision with a carfloat of respondent on October 19, 1947 in the East River.

Libellant's tug, Transfer No. 15, left the vicinity of the float bridges of the Central Railroad Company of New Jersey in Jersey City about 5:20 a. m. on the 19th of October, bound for Oak Point (near 149th Street in the Bronx) with Carfloat No. 58 in tow on her starboard side, and Carfloat No. 44 in tow on her port side. Each carfloat was secured to the tug by a headline, a tow line, and a stern line, and to each other by a cross-line at their bows. The bows of the carfloats pointed at each other ahead of the tug, and flared out behind it. The bow of the tug was about two-thirds of the way back from the bows of the carfloats. The carfloats were about 40 feet wide. No. 58 was 327 feet long, and No. 44 was 317 feet long. The Transfer No. 15 was 132 feet long and 28 feet wide. She was a single screw ship with a right-turning propeller. All the usual navigation lights were burning on the Transfer No. 15, and on her carfloats, prior to the collision.

Respondent's tug was the William J. Dickey, which was towing Carfloat No. 39 on her port side, and Carfloat No. 38 on her starboard side. Each carfloat had cars on it and was 285 to 290 feet long, and 25 to 39 feet wide. The tug was about 150 feet back from the bows of the carfloats, which were towed in a wedge shape with the pointed end forward. The tug was 115 feet long and 25 to 35 feet wide. The Dickey was a single screw ship of 900 horsepower with a right-handed propeller. All the usual naviga-

tion lights were burning on the Dickey and her carfloats.

The Dickey had come from the Long Island Railroad Terminal in the East River, bound for the float bridges of the Central Railroad Company of New Jersey. The tide was ebbing at about four miles per hour.

As is not unusual, libellant's witnesses and respondent's are in substantial conflict as to the positions and courses of the tows immediately prior to the collision. But analysis of the testimony and observation of the witnesses lead to the acceptance of the libellant's version.

The Transfer No. 15 left the float bridges on the Jersey shore and headed toward the Brooklyn shore, passing north of Governor's Island. There was an ebb tide at the time, and its effect was to push the flotilla nearer to Governor's Island and away from the Battery, as the tow crossed from New Jersey to Brooklyn.

There was a light fog, the visibility lowering from a half a mile at 5 a. m. to a quarter of a mile at 6 a. m. The Transfer No. 15 sounded fog signals on the way across. The Dickey sounded no fog signals at any time.

As the Transfer No. 15 approached the Brooklyn shore she turned upstream and proceeded nearly parallel with the Brooklyn pier ends. She was then 600 to 700 feet off the pier ends. Her captain, Kristensen, saw something about 1,000 feet upstream, and soon distinguished a tow with carfloats coming down, showing a green light. He was then off Pier 18, Brooklyn. At that time he sounded two whistles for a starboard to starboard passage. The course of the Transfer was then about northeast, still parallel with the pier ends, or nearly so. He continued on about that course until the time of the collision. When the Dickey was first sighted she was about 300 to 400 feet off a point somewhere between Pier 11 and Pier 12, Brooklyn, and nearer the Brooklyn shore than the Transfer.

Captain Kristensen received no response to his two whistle signal. He continued on his course until the Dickey appeared to be starting to bear to her own starboard. He then sounded two whistles again. To this signal the Dickey responded with alarm whistles. Kristensen stopped and backed his engines, blew backing whistles and alarm whistles. The Dickey thereafter continued to move to her own starboard. The starboard bow corner of the Dickey's starboard carfloat struck the starboard side of the Transfer's starboard carfloat about 20 feet from its bow. The point of contact between the carfloats was about 500 to 600 feet off Pier 16. It was then about 5:40 a. m.

The angle of the collision between the starboard side of the Transfer's starboard float and the starboard side of the Dickey's starboard float was about 60 degrees. It would appear that the Dickey was angling across the upstream course of the Transfer.

The impact of the striking carfloat near the bow of the No. 58 caused the latter's stern line to part. Later the cross line parted also. Only Carfloat No. 58, the starboard float of the Transfer No. 15, was damaged.

Respondent's captain, Keane, testified that the course of the Transfer No. 15 was near mid-channel and not favoring the Brooklyn shore. This does not seem probable in view of the fact that at mid-stream the Transfer would be bucking an ebb tide.

When the vessels first became visible to each other they showed green to green, and were so positioned that a starboard to starboard passing was called for by the meeting rules. Title 33 U.S.C.A. § 203, art. 18; George H. Jones, 2 Cir., 27 F.2d 665; Tanker Hygrade No. 12, Inc., v. The Talisman, 2 Cir., 153 F.2d 52; Transfer No. 15, 2 Cir., 243 F. 174; The Phonix, 2 Cir., 154 F. 474.

The libellant may have a decree.

Concurrently with this opinion, appropriate findings of fact and conclusions of law will be filed.